Claude R. SMITH, Trustee, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 609–89C.

United States Court of Federal Claims.

Oct. 25, 1995.

Henry R. Klein, New Orleans, Louisiana, attorney of record, for plaintiff.

Joel D. Hesch, Washington, D.C., with whom was Assistant Attorney General Frank W. Hunger, for defendant. Marlene M. Surrena and J. Albert Calluso, DPSC, Office of Counsel, of counsel.

## OPINION

HARKINS, Senior Judge:

*Procedural History*

Jurisdiction of this contract case is under the Contract Disputes Act (CDA), 41 U.S.C. § 609 (1988) and the Tucker Act, 28 U.S.C. § 1491(a). The initial complaint was filed November 9, 1989, by Silent Partner, Inc. (SPI), which on April 28, 1989, had filed in the Bankruptcy Court, Eastern District of Louisiana, a petition under Chapter 11. 11 U.S.C. §§ 302 & 1101 et seq. (1988). Plaintiff's status in bankruptcy has resulted in proceedings in this case that have been protracted and complex.

The initial complaint in Counts I through V sought $2.2 million in damages for breach and improper terminations that involved four supply contracts with the Defense Logistics Agency (DLA). The complaint was amended on November 26, 1990, to add Counts VI and VII, which assert bad faith, government delay, brought in another contract, and increased the claim an additional $4.1 million. On December 2, 1991, defendant asserted a setoff for unliquidated progress payments that amounted to $883,800.

During the course of these proceedings both parties have changed counsel of record. Defendant's third counsel of record filed an appearance on September 28, 1990, and has served in that capacity since.

On January 11, 1990, SPI withdrew the attorney that filed the complaint and a new counsel of record was substituted. Proceedings in Bankruptcy Court occupied plaintiff's new counsel and it was necessary to enter an order on October 10, 1990, that directed plaintiff to show cause why the case should

be not be dismissed for failure to prosecute. This issue was resolved and proceedings were continued by order on November 5, 1990. During 1991, and 1992, under plaintiff's second counsel, extensive discovery was undertaken and pretrial preparation was completed on September 14, 1992. Trial was scheduled during the period February 8 to February 26, 1993. On January 25, 1993, defendant reported that the 5th Circuit Court of Appeals on January 8, 1993, had affirmed an order that the Bankruptcy Court had entered on March 20, 1991, which had converted the proceedings to Chapter 7 because SPI no longer was operating as a business, and its only asset was this case. After the March 20, 1991, order, Charles R. Smith had been appointed interim trustee, but had stayed implementation of the order pending appeal. The trustee directed defendant to notify the court that neither SPI nor the second attorney of record had standing to continue the lawsuit. The trial scheduled for February 1993 was cancelled. Ultimately, on August 18, 1993, the trustee was substituted as plaintiff in place of SPI, and a third counsel replaced the counsel that had prepared the case for the February 1993 trial.

During the course of further preparation to reschedule a trial, discovery to take depositions of newly designated expert and fact witnesses was authorized. Pretrial preparation was completed on May 11, 1994. A 14-day trial was held during the period August 16 to September 6, 1994. Posttrial briefing was completed on January 27, 1995.[1]

-----

The following is a summary of the facts that control this decision. The facts stipulated by the parties, which are adopted, and the additional facts derived from the testimony and documentary evidence are stated in the Appendix. The Appendix is incorporated in this decision.

The claims in this case arise from DLA procurements issued by the staff responsible for supplies in the Clothing and Textiles Directorate (CTD) of the Defense Personnel Support Center (DPSC), located in Philadelphia, Pennsylvania. These procurements were administered by personnel in DLA's separate unit, Defense Contract Administrative Service Region (DCASR) in Dallas, Texas, and by personnel responsible for administrative, finance and quality control matters in two DCASR–Dallas subordinate units: Defense Contract Administrative Service Management Area (DCASMA)–San Antonio, for contractor activities in Laredo, or DCASMA–New Orleans, for contractor activities in Gretna, Louisiana. The procurements involved policies applicable to Small Business and Labor Surplus Area (LSA) concerns.[2]

The organization of DLA at the relevant time was complex, dispersed, disjointed, and inefficient. Communications were routinely slow. When mail service was used, communication time between DPSC and DCASMA–New Orleans normally was 5 days. Between DCASMA–New Orleans and DCASMA–San Antonio, the mail service time was 3 days; between New Orleans and Gretna, the mail service time normally was 3 days.

Plaintiff companies involved in the procurements were organized and operated by Timothy T. Zufle, and his wife, Diane R. Zufle. In 1985, they undertook an intensive effort to secure government supply contracts under DOD policies relative to women-owned

1. The transition from Chapter 11 to Chapter 7 in the bankruptcy proceedings and the resulting change in plaintiff's counsel of record impacted identification, collection and presentation of fact evidence and presentation of the legal basis for plaintiff's claims. In the pretrial preparation for the February 1993 trial, for example, the parties filed on September 14, 1992, a Joint Stipulation of Facts that contained items 1 through 117, of which 20 items related to the PASGT vest and a Value Engineering proposal, in addition to the NBC bag, SV–2B Vest, Helmet Cover and Mesh Vest contracts.

Documentary evidence in the record is limited to the Joint Stipulation of Facts, filed April 21, 1994; Joint Exhibits 1 through 116 (Nos. 66–80 not used), 150 plaintiff's exhibits (not in sequence), 15 defendant's exhibits (not in sequence) and nine court exhibits. Numerous exhibits proposed by plaintiff were excluded for failure to comply with pretrial preparation orders, and for inclusion of multiple, unrelated documentary materials.

2. 48 C.F.R. §§ 52.219, 52.200 (1994), FAR, Chapter 1, subchapter D, parts 19 and 20.

small businesses,[3] and set asides for small businesses and LSA concerns. Their vehicle in this effort was SPI.

Tim Zufle was born on August 17, 1948, in Gretna, Louisiana. His experience included work in a family business, Gretna Gun Works, Inc., a supplier of sporting goods and law enforcement equipment. In 1968, he founded Solutions, Inc., a business that custom-made body armor, armored vehicles, structural armor, and undertook special projects related to security. Solutions, Inc. was incorporated in Louisiana in 1974. Diane Zufle was employed in the family business and by Solutions, Inc. from 1974 to 1982.

SPI was incorporated on June 16, 1982, in Louisiana, with Diane Zufle as the majority stockholder and Tim Zufle as the minority stockholder. Tim Zufle was employed by SPI as its president and chief executive officer; Diane Zufle was employed as its vice president, secretary and manager of administrative operations. SPI qualified as a woman-owned, small business subchapter S corporation[4] with its principal place of business in Gretna, an LSA. SPI initially took over the business of Solutions, Inc., and specialized in sales of body armor to individuals in police departments, government organizations and to private security personnel. After SPI was formed, Solutions, Inc. served as its broker in foreign sales of body armor.[5]

In the mid–1980's, SPI undertook a program to secure government supply contracts. In 1986 and 1987, SPI responded to IFBs issued by DPSC, and, based on information obtained in preaward surveys, was awarded a series of fixed-price contracts to manufacture various clothing and equipment items made from specialty textiles.[6]

(1) On October 22, 1986, SPI was awarded a contract to manufacture and deliver 650,000 bags used to carry nuclear, biological, and chemical materials (NBC bag contract), at a unit cost of $3.96 and a total contract price of $2,574,000. The contract called for eight monthly deliveries of 812,-250 units between May 5 and December 30, 1987. The contract contained a 100 percent option quantity clause, which was never exercised.

(2) On November 11, 1986, SPI was awarded a contract to manufacture and deliver 7,200 Survival Vests SV–2B (SV–2B contract), at a unit price of $54.54 and a total contract price of $392,688. The first delivery date was scheduled for June 5, 1987.

(3) On April 8, 1987, SPI was awarded the small business portion of a contract to manufacture and deliver 657,600 chemical protective helmet covers (Helmet Cover contract). On April 16, 1987, Modification PO0001 awarded to SPI and LSA set aside which increased the quantity an additional 657,600 covers. Under the original delivery schedule, the first delivery date was November 19, 1987; after PO0001, the first delivery of 54,960 was due on November 27, 1987. The unit price was $1.7991 and the total contract price was $2,366,-176.32.

(4) On June 11, 1987, SPI was awarded a contract to manufacture and deliver 7,008 survival large mesh vests (Mesh Vest contract), at a unit price of $66.69 for a total price of $467,363.52. The first delivery of 672 vests was scheduled for December 24, 1987.

SPI's bids on the NBC bag and the Helmet Cover contracts, and the awards, were based on plans to manufacture the articles in

---

3. 48 C.F.R. § 19.901 (1994).

4. 26 U.S.C. §§ 1361–63 (1995).

5. The name Silent Partner was derived from the concept that a policeman using a one-man car had a silent partner—his bullet resistant vest.

6. The first amended complaint, filed November 26, 1990, included a new Count VII that concerned claims from a contract awarded October 15, 1987, for 72,000 units of Body Armor, Fragmentation Protective, Ground Troops (PASGT

contract), and claims from a related Value Engineering Change Proposal (VECP # 3088). The PASGT contract claims were excluded on September 14, 1992, pursuant to defendant's motion in limine based on issue preclusion, see In re Matter of Silent Partner, Inc., 119 B.R. 95 (E.D.La.1990). The VECP # 3088 claim was excluded on May 11, 1994, pursuant to defendant's motion in limine based on plaintiff's concession. Plaintiff's claims at trial and in posttrial briefing are limited to the four contracts identified.

Laredo, Texas. Laredo, formerly a large textile/sewing center, had become an LSA with a supply of unemployed experienced personnel caused by plant closings. When SPI's bids were made in 1986, the manufacturing facilities were not in place in Laredo, and skilled production workers in Laredo had not been hired.

During July and August 1986, preaward technical, financial, and production surveys were completed on the NBC bag contract by DCASMA–New Orleans and DCASMA–San Antonio. Each unit recommended that SPI be awarded the NBC bag contract and the other contracts. In the preaward surveys, the government employees relied primarily on information provided by SPI on its financial status and production capability. On paper, SPI convinced the government that it was capable to perform.

SPI's Special Projects Director with responsibility of overseeing the Laredo operation had no prior government contract experience, no prior clothing and textile experience, and no prior experience with complicated specifications. He helped prepare SPI's NBC bag bid. After the bids were opened, the government told SPI that it was concerned that its bid was low, and asked SPI to verify its bid. SPI informed the government that its bid price was correct. SPI did not ask the Special Projects Director for any input in verifying SPI's price, and SPI did not conduct any new time studies to verify components of its bid.

Prior to SPI's bid on the NBC bag contract, SPI's primary experience was in the private sector. SPI manufactured such items as body armor, police bags, bomb blankets, bomb sleds and various other items related to law enforcement protective equipment. SPI was inexperienced in government contracting and in large-scale production. The NBC bag contract was the first contract in which SPI was required to manufacture an item according to a set of detailed specifications from the customer. Because Laredo was a new location for SPI, it had to incur complete start-up costs, such as leasing a facility, purchasing equipment and materials, equipping the offices, and hiring and training employees.

As of October 1986, SPI had six full-time employees, all located in Gretna, Louisiana. Most of SPI's sewing operations were performed by a subcontractor, Alfredo Campos, d/b/a Campos Sewing. Mr. Campos owned most of the machines, which his personnel used to perform sewing for SPI. Mr. Campos stopped performing subcontract work for SPI in late 1987.

SPI's bid was based, in part, upon hiring all skilled workers to perform the NBC bag contract. SPI hired only about 5 percent skilled workers to perform the NBC bag contract.

SPI's bid on the NBC bag contract was based, in part, upon using two shifts of employees. SPI only used one shift of employees after production was authorized.

SPI's bid was based, in part, on receiving 50 percent wage reimbursements under local government programs. SPI did not receive any wage reimbursements under local government programs while in Texas.

During the preaward process, SPI represented to the government that SPI had approximately $200,000 in assets and approximately $128,000 in liabilities, and that SPI had corporate lines of credit totalling $615,000. Diane and Tim Zufle also provided personal financial statements to the government which reflected $6,084,638 in combined personal assets and $247,035 in combined personal liabilities.

SPI failed to disclose in its bid or during the preaward survey that SPI had existing financial problems. At the time that the NBC bag contract was awarded, SPI had a cash flow problem and was thinly capitalized. Prior to the NBC bag contract, SPI only had $3,869 in cash and $29,060 in working capital.

On September 7, 1986, DCASMA–New Orleans informed the procurement contracting officer (PCO) at DPSC that SPI planned to finance the materials for the NBC bag contract and use lines of credit totalling $615,000 to finance the First Article (FA) and thereafter use progress payments to capitalize the remaining production.

SPI intended to use lines of credit or money received from the NBC bag contract,

if awarded, to pay its back taxes. At the time that SPI was awarded the NBC bag contract, SPI owed the IRS unpaid federal employment taxes. In August 1987, the IRS issued a levy on SPI's bank account for $98,-093.06 for taxes dating back to 1984.

During 1986, SPI's accounting system was exceptionally inadequate. On August 1, 1986, Defense Contract Audit Agency (DCAA) notified the administrative contract officer (ACO) DCASMA–New Orleans that SPI did not have an accounting system in place. The PCO at DPSC was cognizant of this fact. During the financial preaward survey of SPI, the PCO noted that once established, the accounting system should be reviewed by DCAA.

During 1987, SPI's job cost system did not balance to the general ledger and SPI had problems in balancing its accounts. SPI's outside CPA did not verify for DCAA that SPI's costs during 1987 were valid.

On March 11, 1987, DCAA notified DCAS-MA–New Orleans that the preaward survey under the Mesh Vest IFB had disclosed no deficiencies in SPI's accounting system that would render the system inadequate or unsuitable for accumulating direct material and labor costs for progress payments under the proposed contract. SPI's cost accounting system did not allocate indirect expenses to cost objectives, therefore, progress payments were limited to direct material, direct labor and other verifiable direct costs.

SPI's efforts to do the work required by the contracts at the Laredo facility were unsuccessful. By August 5, 1987, SPI had determined to close down the Laredo operation and do the work in new facilities in Gretna. Review of SPI's new facility was completed on September 24, 1987, and the PCO modified the contract formally approving the change in location on October 7, 1987.

The only delivery made in Laredo was under the NBC bag contract. This delivery, made on August 18, 1987, was for 14,650 bags. The first delivery in Gretna, 2,400 bags on December 23, 1987, contained bags that had been manufactured in Laredo.

The NBC bag contract required eight monthly deliveries (81,250 bags per month)

between June 4 and December 30, 1987. SPI delivered a total of 95,750 of the 650,000 NBC bags required under the contract. The following table shows the dates and the amounts that were delivered during the period August 18, 1987, through February 13, 1989:

| 08/18/87 | 14,650 bags |
|---|---|
| 12/23/87 | 2,400 bags |
| 02/01/88 | 19,200 bags |
| 03/23/88 | 20,400 bags |
| 05/13/88 | 21,600 bags |
| 07/10/88 | 3,600 bags |
| 08/22/88 | 5,500 bags |
| 12/02/88 | 6,000 bags |
| 12/22/88 | 1,200 bags |
| 02/13/89 | 1,200 bags |

In a unilateral modification of the NBC bag contract (Mod PO0007), the PCO on August 11, 1988, scheduled eight monthly deliveries, with the first delivery of 80,650 being due on December 10, 1988. On March 2, 1989, the PCO in Mod PO0008, unilaterally terminated for default five delivery increments (406,250 bags) because of the failure to deliver in accordance with the Mod PO0007 schedule.

During the spring of 1988, Tim and Diane Zufle formed a new company, Silent Partner Body Armor (SPBA) and divided SPI's assets with SPBA. SPI's commercial operations were spun off to SPBA; all of the contracts with DLA remained in SPI. SPI filed for bankruptcy under Chapter 11 on April 28, 1989.

The PCO by unilateral modification (Mod PO0010) on August 4, 1989, issued a schedule for monthly deliveries between December 1989 and April 1990 for a total of 148,000 NBC bags.

On January 16, 1990, SPI filed a motion in the Bankruptcy Court for authority to assume the NBC bag contract. SPI's motion was denied at a hearing on March 13, 1990. By order dated April 9, 1990, the Bankruptcy Court noted that SPI had made no deliveries under the NBC bag contract as modified by PO0010 and therefor was presently in default under the revised delivery schedule. On May 23, 1990, the Bankruptcy Court lifted the automatic stay under 11 U.S.C. § 362 for the purpose of permitting the United States

to pursue administrative measures necessary to terminate the contract.

The PCO in unilateral modification PO0011, on May 24, 1990, determined SPI had abandoned the contract and terminated the contract for failure to deliver in accordance with the revised delivery schedule.

The SV–2B contract as let called for delivery of 7,200 vests in 12 monthly shipments of 600 units from June 5, 1987, through May 1, 1988. Modification PO0004, August 27, 1987, invoked the 100 percent quantity option and increased the total quantity to 14,400 vests. SPI delivered 7,344 vests out of the required 14,400 SV–2B vests. The SV–2B contract was default terminated on March 23, 1989, for failure to meet the delivery schedule.

The Helmet Cover contract, as amended, called for delivery of 1,315,200 covers, with a first delivery of 54,960 due on November 27, 1987. SPI did not make any deliveries apart from the FA quantity of 12 helmet covers. SPI never obtained passing and reliable helmet cover material. Modification PO0004 was issued on March 13, 1989, default terminating the Helmet Cover contract.

The Mesh Vest contract called for delivery of 7,008 vests, in four deliveries of 672 vests and six deliveries of 720 vests, scheduled to begin on December 24, 1987. On June 30, 1988, SPI made its only delivery, apart from the FA, consisting of 93 vests, all of which were accepted by the government. There were no further deliveries under the Mesh Vest contract. On March 23, 1989, the Mesh Vest contract was terminated for default due to SPI's failure to meet the delivery schedule.

Eight accountants assisted SPI in setting up an acceptable accounting system between December 1986 and June 1988. Five were retained by SPI as subcontractors, and three were employed by SPI. On or about June 13, 1988, SPI gave DCAA an accounting demonstration of its accounting system software program. On August 25, 1988, DCAA issued an audit report determining that SPI's accounting system was adequate to support progress payment requests for direct and indirect costs under fixed-price contracts.

SPI received a total of $1,225,052.34 in progress payments under the NBC bag contract. The following table shows the amount and date paid on each of five requests:

| | | |
|---|---|---|
| Request # 1 | $361,128.00 | Paid 5/19/87 |
| Request # 2 | $515,148.00 | Paid 8/06/87 |
| Request # 3 | $150,441.00 | Paid 5/10/88 |
| Request # 4 | $119,199.00 | Paid 6/13/88 |
| Request # 5 | $ 79,136.34 | Paid 7/20/88 |

SPI had $883,000 outstanding in unliquidated progress payments at the time the NBC bag contract was terminated. During SPI's bankruptcy proceedings, the government received $86,104.35 in proceeds from the sale of material that Burlington was holding. This amount reduced the unliquidated progress payments to $797,695.65 under the NBC bag contract.

Progress payments were received under the other three contracts. SPI received $359,516 in progress payments under the SV–2B contract, and payments of $180,913.23 for the 7,344 vests delivered. SPI was paid $9,533 in progress payments under the Helmet Cover contract. SPI received $201,105 in progress payments under the Mesh Vest contract. There are $196,143.26 in unliquidated progress payments under the Mesh Vest contract.

Throughout this case SPI and the Zufles have contended that the failure to perform these supply contracts was the result of unjustifiable delay and disruption caused by government employees in DLA who were responsible for the procurements, primarily the PCOs in DPSC and Quality Assurance Representatives and Specialists (QAR and QAS) in DCASMA–San Antonio. The procurement process in the clothing and textile directorate allegedly was infiltrated with fraud and corruption, tainted by bad faith, and at the very least characterized by such ineptitude, negligence and incompetence that the government was liable in damages for breach of contract.

In its posttrial brief, plaintiff contends defendant specifically breached the NBC bag contract and the Helmet Cover contract. The breach of the NBC bag contract is claimed to have resulted in a ripple effect which disrupted SPI's work sequence and diminished its productivity in the SV–2B,

Mesh Vest and Helmet Cover contracts. All of the contracts are seen by plaintiff as linked together so that the responsible PCOs administered the contracts on an interrelated basis.

Plaintiff itemizes in categories (a) through (m) the ways in the NBC bag contract in which the government purposely hindered, disrupted, and interfered with SPI's right to perform efficiently.[7] All of these categories are founded on either, or both, breach of contract, due to breach of the duty of good faith or breach of contract due to government caused delay. In regard to the Helmet Cover contract, plaintiff additionally claims the government breached the contract by subjecting SPI to tests conducted pursuant to the wrong military specifications.

Plaintiff claims damages on all four contracts. The bases on which the amounts are calculated differ. On the NBC bag contract, the recovery is for the full amount of SPI claim for an equitable adjustment filed November 30, 1988, as later amended, with interest from the date of filing. On the SV–2B contract, the Mesh Vest contract and the Helmet Cover contract, the recovery is for actual excess costs and anticipated profits lost, with interest. The amounts are as follows:

| | |
|---|---|
| NBC bag | $ 905,755.00 |
| SV–2B | $ 377,158.41 |
| Mesh Vest | $ 129,394.87 |
| Helmet Cover | $ 212,522.75 |
| TOTAL | $1,624,831.03 |

## DISPOSITION

First, it is necessary to put plaintiff's description of the issues in perspective. Plaintiff's argument is rife with sweeping implications that have little or no basis in fact. These matters infect the contract issues with extraneous, erroneous and irrelevant concepts.

7. Plaintiff's NBC bag contract breach categories were:
  (a) The LSA Fiasco
  (b) Failure to Timely Award Contract
  (c) Delays in Conducting Post Award Survey
  (d) The Failure to Take Samples
  (e) IL7 Issues
  (f) Sophia Borja's First Overture
  (g) The Failure of SPI's First Article
  (h) Sophia Borja's Second Overture
  (i) The Failure of SPI's Second First Article

*DPSC History*

During the trial and in its posttrial briefs plaintiff attempts to link the default termination to criminal and scandalous conduct. Plaintiff argues that the court should take judicial notice that DPSC "was riddled with fraud and corruption."

In support of this argument, plaintiff cites testimony and statements presented on March 1, 1989, to the House Committee on Armed Services that concerned investigation and prosecution of corruption and fraud involving personnel in the DPSC. The testimony and statements were by the Assistant Attorney General, Criminal Division, Department of Justice, and by the Major General in command of the DPSC. The investigation was underway in 1983; it covered a 25 year period; indictments were announced in February 1987; and by 1989 the investigation had resulted in the conviction of 18 individuals and seven corporations, and the recovery of $4.2 million in RICO forfeitures, criminal fines and civil judgments.

The 1989 testimony and statements are not in evidence; they were included in the transcript of one day in 16 days of hearings by the House Armed Services Committee; the transcript was attached to plaintiff's November 30, 1994, posttrial brief. The transcript and the statements, if offered at trial, would not have been admissible because they are not relevant to plaintiff's claims. Judicial notice of the transcript and the statement is not required under Rule 201 of the Federal Rules of Evidence because it does not relate to adjudicative facts. None of the actions of DLA personnel that are involved in plaintiff's claims were shown to be related to the investigation of the DPSC or to the actions of persons or companies that were indicted and subsequently convicted.[8]

  (j) The Change of Location Request
  (k) SPI's Third First Article
  (*l*) Unilateral Imposition of Delivery Schedule
  (m) Bad Faith Negotiations

8. Plaintiff's documentary evidence includes reports written by DCASMA—New Orleans Industrial Specialist Henry Joseph and Production Section Chief Robert West that contained estimates that 95 percent of the delay was government caused, and that the NBC bag contract had

Plaintiff also contends that DPSC actively protected an oligopoly of a few entrenched suppliers and resisted new competition such as provided by plaintiff. Efforts plaintiff sees as designed for the elimination of plaintiff's competition are asserted to be a violation of the antitrust laws. Claims for violations of the antitrust laws are not within the scope of the Tucker Act. Correction of the effects of oligopoly as a market concept is not a program within the scope of contract claims to be litigated under the CDA.

*Good Faith*

Plaintiff adds a gloss to the concept of the good faith requirement that has no application to the supply contracts awarded SPI. It is a fundamental principle of contract law that every contract with the government contains an implied obligation that neither party will do anything to prevent, hinder, or delay performance.[9] Plaintiff would expand the obligation not to hinder performance to include an affirmative obligation on the government to cooperate in such a manner so as to do whatever is necessary to enable SPI to perform.[10] The government failure to affirmatively cooperate was said to be so egregious as to amount to bad faith. The government supposedly interfered with SPI's right to perform efficiently in such proportions as to be willful.

The government obligation to do whatever is necessary to enable a contractor to perform arises in relationships where the government has contracted to do more than accept delivery and pay for supplies that are supposed to comply with specifications that have been approved for competitive bidding procedures. Such obligation arises in contracts that contain reciprocal obligations, primarily construction contracts, such as timely delivery of government-furnished property, sequential site surveys, timely delivery of amended construction drawings, or failure to set major construction and reference point stakes.

In simple IFB supply contracts, such as the four in issue, the government has no such concurrent obligations. The government's obligation is to pay a specified amount for goods timely delivered. DPSC does not become a partner responsible for contract performance as in the construction contracts cited by plaintiff. The policies behind the small business and women-owned business programs is to provide an opportunity to participate in government procurements. The government is not expected to be a guarantor of success.

When a contract contains fixed dates for performance, it is presumed that time is of the essence.[11] It is well settled that a contracting officer properly can terminate a contract where the contractor fails to meet an established delivery schedule.[12]

Claims founded on a breach of the government's duty of good faith in administering a contract, confronts plaintiff with a most difficult burden. Allegations of bad faith cast against the government are met with the "presumption that public officials act conscientiously in the discharge of their duties" which must be present in " '[a]ny analysis of a question of governmental bad faith.' "[13] Further, "[i]t must be recalled

a "ripple effect" on other contracts. Mr. Joseph was convicted in 1991 of a felony, mail fraud, false claims and misrepresentation of a social security number. His prosecution did not involve any action related to the four contracts in this case. It is ironic that plaintiff relies upon these documents as support for its claims. The delays and ripple effects in the documents cited by plaintiff are shown by the testimony and joint exhibits to be unsubstantiated and unsupported.

9.  *Lewis–Nicholson, Inc. v. United States*, 550 F.2d 26, 32, 213 Ct.Cl. 192 (1977).

10.  Plaintiff cited *Lewis–Nicholson, Inc.*, 550 F.2d at 32; *Kehm Corp. v. United States*, 119 Ct.Cl.

454, 93 F.Supp. 620, 623 (1950); *see, e.g., J.G. Watts Constr. Co. v. United States*, 355 F.2d 573, 174 Ct.Cl. 1 (1966); *Peter Kiewit Sons, Co. v. United States*, 138 Ct.Cl. 668, 151 F.Supp. 726 (1957); *H. John Homan Co. v. United States*, 418 F.2d 522, 189 Ct.Cl. 500 (1969).

11.  *DeVito v. United States*, 413 F.2d 1147, 1154, 188 Ct.Cl. 979 (1969).

12.  *Id.*

13.  *Kalvar Corp. v. United States*, 543 F.2d 1298, 1301, 211 Ct.Cl. 192 (1976) (quoting *Librach v. United States*, 147 Ct.Cl. 605, 612, 1959 WL 7633 (1959)).

that the standard for demonstrating the bad faith of government officials is a very high one. Plaintiff must come forward with well-nigh irrefragable proof to overcome [this] presumption of good faith."[14] The irrefragable proof standard is satisfied by a showing of "*some specific intent to injure the plaintiff.*"[15] Plaintiff is required to show that the accused PCOs Panichelle and Pelullo possessed this specific intent to injure while administering the NBC bag various contract. Plaintiff has made no such showing.

*Vested Property Right*

Plaintiff contends that long before SPI was awarded the NBC bag contract it was disrupted, distracted and hindered in its preparation for the contract. Plaintiff characterizes the LSA portion of the contract as a "vested property right" for SPI. Plaintiff argues that any administrative action that affected this property right required adherence with fundamental due process hearing procedures.

This argument is without merit. Plaintiff never had a "vested property right" in the LSA set aside portion. Amendment A0001 effective May 5, 1986, to the NBC bag solicitation instructed the bidders not to submit a bid price on the LSA set aside portion. Funding was never authorized for the LSA, and the LSA portion was cancelled on November 19, 1987, due to lack of funding. The LSA portion of the solicitation could not have been awarded to an eligible bidder unless and until funding for the LSA award was approved.[16] Nor could the LSA set aside be awarded until after both of the GAO protests were resolved.[17]

Plaintiff's constitutional due process analysis is moot. In any event, on the facts, plaintiff was permitted to present its case to the GAO. SPI had a hearing, and the GAO found on the information presented that DLA was reasonable in the determination that SPI was not in a location eligible for an LSA set aside.

*Credibility of Witnesses*

The record contains numerous instances where testimony of defendant's witnesses is in direct conflict with or is substantially different from the testimony of Tim Zufle or Diane Zufle. The testimony of PCO Pelullo was challenged by plaintiff because she was part of a government agency that was "in decline because of 'manipulation of the procurement process'"; she allegedly engaged in ex parte conversations with a rival bidder in the GAO protest, and she rendered a determination that SPI was ineligible for the LSA portion of the NBC bag contract because of confusion in the Laredo location. Her actions allegedly were "borne of corruption and favoritism and constitute the gravest of bad faith" so that her "sworn words are worthy of no belief whatsoever."

QAR Borja allegedly attempted to "extort SPI" by asking Tim Zufle to hire her husband. She wrote and handed to him a note with the name of her husband, his company name and telephone number. Plaintiff argues that QAR Borja asked Tim Zufle to hire her husband or she would fail SPI's FA. As to this incident, the testimony of QAR Borja is in direct conflict with that of Tim Zufle.

PCO Pelullo spoke with the rival bidder, on two occasions. Plaintiff uses terms such as ex parte to describe the two conversations, but does not develop any evidence of PCO Pelullo's intent to harm plaintiff. The fact of the matter is that plaintiff failed to prepare its bid adequately by clearly indicating that its plant was within an LSA. How PCO Pelullo felt is meaningless because the GAO is the body that ultimately concluded that

**14.** *Fucik v. United States,* 655 F.2d 1089, 1097, 228 Ct.Cl. 379 (1981); *see also Sanders v. United States Postal Service,* 801 F.2d 1328, 1331 (Fed. Cir.1986).

**15.** *Kalvar Corp.,* 543 F.2d at 1302.

**16.** *See* Anti–Deficiency Act, 31 U.S.C. § 1341(a)(1) (1982) (prohibiting entering into a contract in advance of appropriation).

**17.** 31 U.S.C. § 3553(c)(1), (2) (1994 Cum.Supp.) (a contract may not be awarded while a GAO protest is pending absent a finding by the head of the agency of urgent and compelling circumstances).

plaintiff did not "unequivocally state a commitment to perform in an LSA."

■ Plaintiff essentially argues that after the bids were opened, SPI should have been allowed to supplement its bid to change its stated location of performance of the "Texas Industrial Park," which is not in an LSA area, to the "Modern Industrial Park," where SPI ultimately located and which is in an LSA area. Eligibility for an LSA is determined solely by the information in the bid as submitted, and cannot, as a matter of law, be supplemented after bid opening. PCO Pelullo correctly stated in her memorandum that SPI was not eligible for the LSA because the Texas Industrial Park was not in an LSA area.

QAR Borja denied the allegation that she asked Tim Zufle to hire her husband, and provided a reasonable explanation why she gave her husband's name to Tim Zufle. Mr. Zufle's denial that he asked QAR Borja for the name of a broker or for her husband's name raises a credibility issue. However, this falls far short of the " 'well-nigh irrefragable proof' to induce the court to abandon the presumption of good faith dealings." [18]

The testimony of Tim Zufle about the events involving QAR Borja is not credible. Plaintiff bolsters Tim Zufle's allegation by stating that his description of events are "corroborated" by Diane Zufle, and other witnesses. Tim Zufle, however, testified that he and QAR Borja were alone when the alleged extortion attempts were made. Accordingly, no one could possibly corroborate Tim Zufle's testimony that QAR Borja actually asked him to hire her husband. At best, others merely could provide hearsay testimony as to what Tim Zufle told them. Tim Zufle did make allegations of extortion to others, including the Defense Criminal Investigation Service—which determined that there was insufficient evidence to taken any action.

Tim Zufle also made allegations that PCO Pelullo desired a kickback to award the NBC bag contract, and that several other officials of DLA were involved in some vague conspiracy against SPI. Tim Zufle even testified that he, himself was acting under what he described as "war rules" against the government before the contract was awarded. None of the "extortion," "kickback," "conspiracy," or "graft" allegations made by Tim Zufle are credible.

Both Tim and Diane Zufle misled Mr. Finning, of Burlington Industries, in negotiating the terms and conditions for ordering materials. Diane Zufle also misled SPI's bank by inaccurately advising bank personnel that the government issued a stop work order due to the size of the bags. Tim Zufle also testified that he and his wife filed claims of $1 million against SPI's bankruptcy estate for alleged litigation support they provided to SPI. The only hope the Zufles have to recover any portion of their claims against SPI, is if plaintiff wins this action.

In summary, on the basis of the demeanor of the witnesses, capacity to recall events, and the reasonableness of explanations given, the testimony of QAR Borja, PCO Pellulo and PCO Panichelle is credible. The testimony of Tim and Diane Zufle is not credible.

*DOD–OIG Report*

The record includes drafts of a report prepared by the Department of Defense, Office of the Inspector General (DOD–OIG) of an investigation into alleged improprieties and mismanagement by DPSC personnel of the NBC bag contract. SPI references or quotes from the draft report to support six of its claims.[19] The investigation was conducted at the verbal request of Representative John P. Murtha, chairman of the Defense Subcommittee, House Appropriations Committee, pursuant to a request from subcommittee member Representative Bob Livingston on behalf of his constituent, SPI.

The draft report, dated March 20, 1990, was prepared by an investigator in the Special Inquiries Directorate in DOD–OIG. The Inspector General sent a draft report on

---

18. *Kalvar Corp.,* 543 F.2d at 1301–02.

19. The Failure to Take Samples
IL7 Issues
The Failure of SPI's First Article

SPI's Third First Article
Unilateral Imposition of Delivery Schedule
Bad Faith Negotiations

April 5, 1990, to DLA for review and comment. The Inspector General's transmittal letter stated the investigation had determined that DLA employees were dilatory in responding to SPI but "most of their actions had little impact on the contractor's ability to perform," and although SPI had showed some healthy signs of recovery, it "stopped production of its own volition."

The draft report was based on a complaint prepared by Diane Zufle that alleged SPI's inability to perform the NBC bag contract was due to arbitrary, capricious, and dilatory actions by DLA employees. The structure of the draft report is based upon a written chronology presented by Diane Zufle to the special inquiries investigator.[20] The investigator, in addition to Diane Zufle, interviewed among others, QAR Borja, PCO Pelullo, PCO Panichelle, and unidentified personnel at DCASR–Dallas and Headquarter DLA. In addition to findings based on incidents in SPI's chronology, the draft report has sections captioned Other Findings, Conclusions, and Recommendations.

One conclusion of the draft report was as follows:

> We believe that all of the described DLA activities were dilatory but most did not have a direct impact on the complainant's

manufacturing operations. We operated on the presumption that until the government changes the conditions of the contract, the contractor is required to perform under the existing contractual obligations. The complainant was obligated to continue performing under the given contractual conditions until the DPSC made the appropriate changes.

The draft report described two incidents believed to affect SPI's ability to perform: (a) delay in taking fabric samples and approving patterns, and (b) delay in approving SPI's change of location. The draft report's recommendations are limited to actions to correct internal administrative problems identified during the investigation. Disciplinary action against QAR Borja and PCO Panichelle was recommended. Because of ongoing litigation, the draft report did not recommend any contract remedies, with an observation that "[w]e believe the U.S. Claims Court will make that determination."

On May 3, 1990, DPSC's internal counsel advised the General Counsel, DLA that the draft report "duplicates the complaint" filed by SPI, that defendant's answer denied the allegations of breach of contract and corollary impact, and that it would not be prudent to file a response during ongoing litigation.[21]

---

20. The incidents that allegedly impaired SPI's performance were discussed in the draft report as findings relative to Allegations Nos. 1 through 7.

Allegation # 1  The Quality Assurance Representative from the DCASMA was Negligent in Supervising the Contract.
(a) Failed to take Fabric Samples in a Timely Manner.
(b) Failed to Approve SPI Working Patterns before the NBC Bag Was Produced.
(c) Caused Complainant to Miss Date for First Article Inspection as Required by Contract.
Allegation # 2  The QAR–SA fabricated a "defect" during a Second First Article Inspection to Justify Failing the Complainant's Production of the NBC Bags.
Allegation # 3  Arbitrary and Capricious Acts by the DPSC Created Significant Delays Which Affected the Complainant's Ability to Perform.
1. PCO # 1 acted arbitrarily in excluding SPI from being awarded the labor surplus portion of the contract.
2. Unreasonable delay in processing modification number PO0005 disclosing a change of manufacturing locations.

3. PCO # 1 unnecessarily required the complainant to produce another first article quantity for inspection without stipulating the requirement in modification number PO0005.
4. PCO # 1 issued modifications that had unreasonable delivery schedules.
Allegation # 4  DLA Was Slow in Processing "No Cost Change" Suggestions Submitted by SPI.
Allegation # 5  DLA Contracting Personnel were Delinquent in Extending the Complainant's Delivery Schedule for government-Caused Delays.
Allegation # 6  DCASMA–NO Personnel Unduly Delayed Paying Progress Payments.
Allegation # 7  The DPSC Laboratory used Improper Standards for Verifying Fabric Tolerance and Testing Shade Gradation on Submitted Fabric Samples.

21. The May 3, 1990, memorandum includes:

This report duplicates in large measure the complaint filed by Silent Partners, Inc., in its Claims Court action. In that proceeding the government has filed its answer denying the

On May 16, 1990, DLA notified the DOD Inspector General that, while it did not concur in the report, it would not be prudent to respond in total during ongoing litigation.

During the course of this case, the incidents listed in the draft report have been examined in the context of the legal responsibilities and requirements established in the NBC bag contract. It is clear that SPI's failure to perform on the four contracts at issue was not caused by defendant. None of SPI's delay claims establish a breach of contract for which defendant is liable in damages.

*Delay Damage*

█ A contractor may not collect damages from the government due to delay where that contractor was itself in a state of concurrent delay. "Generally, courts will deny recovery where the delays are 'concurrent or intertwined'...."[22] Even where both parties are responsible for delay, a contractor may not recover unless it is able to apportion the delay and expense attributable to each party.[23] The burden of apportioning delay falls on the plaintiff. "Courts will deny recovery where delays are concurrent and the contractor has not established its delay apart from that attributable to the government."[24] Plaintiff's delay claims require analysis as to the validity of plaintiff's cited examples of government caused delay, and analysis of plaintiff's state of readiness at those times.

SPI was not in a position to begin full-scale manufacturing until some time after June 5 and 11, 1987, when it received its first shipment of production materials. SPI concedes that without production materials, it could not have engaged in full-scale production. SPI agrees that at least as of the issuance of Modification PO0002, dated May 8, 1987, there were no technical problems that would inhibit SPI's full-scale production of NBC bags. Accordingly, plaintiff's claim fails because SPI cannot clearly apportion the alleged delay caused by the government from its own delay.

Plaintiff complains about delay in awarding the contract, conducting post award surveys, taking samples, resolving technical data package issues, approving SPI's change of location and approval of FAs. In none of these incidents did SPI recognize and apportion the amount of delay, for which it was responsible.

*SPI Performance Deficiencies*

Plaintiff's failure to manufacture and deliver the number of NBC bags contracted for was not caused by delays for which defendant is liable under the contract. SPI's performance failure in the NBC bag contract results from a number of deficiencies in SPI's preparation to enter DOD procurements. SPI was unfamiliar with government contracting procedures and the structure of DOD administrative relationships in supply contracts let by the CTD of DPSC. SPI lacked sufficient resources to undertake a contract of this magnitude. SPI owed employment taxes dating back to 1984 to the IRS. These unpaid taxes were the subject of a levy on SPI's bank account in August 1987 and SPI used $100,000 from the NBC bag contract progress payments to pay for these back taxes. SPI on February 28, 1987, on accounts payable invoices from its vendors totalling $404,822, was over 90 days late on invoices worth $61,219; by June 30, 1987, invoices over 90 days late amounted to $111,-600 of a $668,903 total.

SPI's accounting system was so primitive it could not show direct labor and material costs until March 1987, and was not acceptable to support progress payments for indirect costs under fixed-price contracts until

allegations of breach of contract and corollary impact. The case will now proceed to trial where ultimately, based upon the complete litigation of the relevant facts and upon the applicable law, a judicial determination will take place.

While the Defense Logistics Agency does not concur with the report, it would not be prudent to file a response during ongoing litigation, thereby adding to an extract judicial rec-

ord. Accordingly, a response to the report is being withheld until litigation is completed.

**22.** *Blinderman Constr. Co. v. United States,* 695 F.2d 552, 559 (Fed.Cir.1982).

**23.** *Coath & Goss, Inc. v. United States,* 101 Ct.Cl. 702, 714–15, 1944 WL 3694 (1944).

**24.** *William F. Klingensmith, Inc. v. United States,* 731 F.2d 805, 809 (Fed.Cir.1984).

August 1988. Other deficiencies were lack of competent management personnel and a trained labor force, and failure to obtain needed sewing equipment on a timely basis.

*Ripple Effect*

Plaintiff claims government caused delay and disruption on the NBC bag contract resulted in a loss of efficiency and caused lower than normal productivity in the other three contracts. SPI's claim for "ripple effect" damages is without merit.

■ A ripple effect claim compensates a contractor for damages caused to one or more contracts as the result of the impact from actions relating to an entirely different contract. Plaintiff ignores the fact that such a claim is rarely allowed. Such damages are usually considered to be too remote or too speculative and subject to the rule that consequential damages are not recoverable under government contracts.[25]

Plaintiff cites to a case which did allow a contractor to recover these impact damages.[26] Plaintiff omits the fact that *Ingalls* clearly limits itself to the very particular fact in that case that the suspension clause was worded in such a way to provide for more general damages. Plaintiff's citation to *Ingalls* ignores the fact that CIBINIC & NASH, to which plaintiff also cites, specifically points out this distinction. CIBINIC & NASH clearly state that the "board emphasized that such recovery was permitted only because of the specific language contained in the unique Suspension of Work clause used in ship building contracts."[27] In addition to this omission, plaintiff also fails to mention that there is another BCA case, also cited in CIBINIC & NASH, which denies recovery because this special provision was not in the contract.[28]

■ None of SPI's contracts at issue were for the building of ships. Accordingly, they did not include the special provision for ship building contracts. Therefore, the exception created in *Ingalls* does not apply to the present situation. Contractors may only otherwise recover ripple damages in the "exceptional circumstances" involving such government treachery as intentionally delaying the other contracts.[29] Plaintiff has not established that the contracts under review satisfy this narrow exception to the general rule barring impact costs.

*Final PCO Decisions*

Plaintiff seeks to set aside the final decisions of PCO Pelullo because of alleged overreaching in negotiations on plaintiff's two claims for equitable adjustments. At various times, the PCO used 160 days or 193 days as delays attributable to the government in formulating its negotiating position; but in the final decision recognized only 105 days. At all times SPI claimed the government was responsible for more delay days.

■ All negotiations to reach agreement on the claims for equitable adjustment were unsuccessful. Plaintiff seeks a review here of the PCO's final decisions. Under the CDA, decisions of the contracting officer are considered de novo.[30] Plaintiff's claims have been reexamined. The record establishes SPI was not entitled to any excusable delays.

*Other Alleged Breaches*

Failure to Timely Award Contract: The bids were opened on July 1, 1986, and the final day for the government to accept was 60 days later, August 30, 1986. The contract was awarded on October 22, 1986, 53 days after the contractually mandated period. The time for government acceptance is spe-

**25.** *See Northern Helex Co. v. United States*, 524 F.2d 707, 207 Ct.Cl. 862 (1975); JOHN CIBINIC, JR. & RALPH C. NASH, JR., ADMINISTRATION OF GOVERNMENT CONTRACTS 527 (2d ed. 2d printing 1986) [hereinafter CIBINIC & NASH]. *See also General Dynamics Corp. v. United States*, 585 F.2d 457, 218 Ct.Cl. 40 (1978) (denying contractor ripple effect damages).

**26.** *Ingalls Shipbuilding Div.*, ASBCA 17579, 78-1 BCA ¶ 13,038, 1978 WL 2301 (1978).

**27.** CIBINIC & NASH, *supra* note 25, at 529.

**28.** CIBINIC & NASH, *supra* note 25, at 530 (citing *Flores Drilling & Pump Co.*, AGBCA 82-204-3, 83-1 BCA ¶ 16,200, 1982 WL 7291 (1982)).

**29.** *General Dynamics*, 585 F.2d at 465-66.

**30.** 41 U.S.C. § 609(a)(3) (1988).

cifically stated in the solicitation.[31] If the government needs more time to accept, it should request that the several lowest bidders extend the bid acceptance period in writing.[32] Defendant did not. Defendant accepted plaintiff's offer 53 days late.

■ Defendant's tardiness does not create a right to damages, and the record does not show that any damages resulted. FAR § 14.404–1(d) is aimed at administrative efficiency; the provision states that the government should request extensions to avoid the need for resolicitation. No substantive right is created on which a contractor could erect a damage claim. Nowhere in the regulation, nor in any cases, is such a contractor's right discussed. Plaintiff does not cite to any case, statute, or regulation.

Plaintiff contends that this delay now has made them "suspicious." There is no evidence in the record of any intent by government representatives to injure plaintiff by this delay. There is evidence that the government principally was concerned with the abilities of SPI to perform the contract. Plaintiff has failed to demonstrate any damages arising from this delay.

Delays in Conducting Post Award Survey: The contract was awarded on October 22, 1986, and a post award conference was held in Laredo, Texas on January 12, 1987. At the informal November 18, 1986, meeting, the parties agreed to schedule a conference for early December 1986. The contract was misplaced and QAR Borja did not receive a copy until after she returned from vacation in January 1987. This delayed the conference until January 12, 1987. Plaintiff was ready to conduct the conference with defendant on November 18, 1986; and, consequently, defendant is responsible for this delay.

■ A post award conference is not mandatory. The contract does not require defendant to conduct a post award conference. Defendant has not breached a contractual duty. Moreover, the delay in holding the conference did not impact plaintiff's performance in submitting its FA on February 20, 1987. Plaintiff did not have its FA production materials until December 1986, the sewing machines were held up due to problems with the vendor, and employee training did not begin until after January 12, 1987. If defendant had met with plaintiff on November 18, 1986, production would not have begun any earlier.

Failure to Take Samples: Plaintiff alleges the government's failure to test timely its FA material or to conduct an in-process inspection constitute contract breach. This argument is fallacious. The NBC bag contract does not require in-process inspection and component testing by the government. Solicitation amendment A0003, issued June 11, 1986, clearly deletes all in-process inspections.

■ Clause E21, which was added by amendment A0003, does allow the government to conduct its own testing, and provides time frames for such. That clause does not, however, require defendant to conduct its own testing. It is a right rather than a duty. Merely because the government may have a right to conduct an inspection or perform a test does not create an obligation to inspect or test.[33] Under the terms of the contract, the government was *not* required to perform component tests on SPI's material or conduct any inspections of SPI's operations.

Defendant, however, ultimately did decide it wanted to take samples. While not required to do so, defendant did take samples on February 25 and 27, 1987. The samples failed to meet contract specifications for resistance to organic liquids and dimensional

**31.** Clause K85 of the NBC bag contract incorporates FAR § 52.214–16, as required for sealed bid contracts by FAR § 14.201–6(j), which mandates a specific period of time for government acceptance. Plaintiff inserted 45 days, but this was overridden by amendment A0001 to the solicitation, which inserted 60 days. FAR § 52.214–16(e) (1994).

**32.** FAR § 14.404–1(d).

**33.** *Penguin Indus., Inc. v. United States,* 530 F.2d 934, 936–37, 209 Ct.Cl. 121 (1976) (the government is not required to conduct tests or inspections; they are for the benefit of the government, not the contractor); *Kaminer Constr. Corp. v. United States,* 488 F.2d 980, 986, 203 Ct.Cl. 182 (1973) ("The right to inspect does not imply the duty to inspect.").

stability of warp. SPI received notification on April 27, 1987, of the material failure. The situation was not clarified until Modification PO0003, effective June 10, 1987, removed the organic liquid and dimensional stability of warp requirements. Defendant was dilatory both in making the decision to take samples, and carrying out that decision.

Defendant's delay, however, did not have an effect on SPI's performance. Plaintiff ordered its FA material by invoice dated December 2, 1986. That is over 1 month before the post award conference, when plaintiff hoped that defendant would take samples. Plaintiff produced its FA on time. From November 1986 through March 1987, plaintiff and Burlington were negotiating the terms of their supply arrangements. By invoice dated April 15, 1987, plaintiff ordered 60,987 yards of production material from Burlington. Thus, plaintiff was not waiting for the samples to be pulled in February 1987, or the results of the tests in April 1987, or the issuance of the modification in June 1987. As soon as plaintiff came to terms with its supplier, plaintiff ordered its first shipment of 60,000 yards. In terms of its material, plaintiff did not wait for defendant to move forward regarding component testing.

Regardless of defendant's delays in sampling and testing, plaintiff could have never delivered its first shipment on time on June 4, 1987. Plaintiff did not receive its first real production quantity of material until June 5, 1987. This schedule problem is not attributable to defendant. Plaintiff did not have a purchase order with its supplier until March 23, 1987, and, on April 15, 1987, plaintiff ordered its first shipment of 60,000 yards. Plaintiff knew, however, that such an order could take two months to receive, and it did.

IL 7 Issues: The IL7 clause of the NBC bag contract expressly states that the government does not warrant, expressly or impliedly, the adequacy of the Technical Data Package. The clause goes on to require the contractor to review the package, identify deficiencies, and recommend changes. All recommendations made by the contractor must be approved or disapproved within five days of their receipt, all changes made to the contract pursuant to this clause will be at no cost. If the government exceeds the 5–day period, an extension of the delivery schedule equal to the delay will be made.

The requirements under the IL7 clause are clearly stated. Plaintiff's requests to change the stitch requirements are not, however, governed by this clause. Plaintiff's desire to change the stitch tolerances was not aimed at correcting a deficiency in the contract. Rather, plaintiff merely sought to accommodate its own particular needs.

Plaintiff submitted four DD–1426 forms regarding various changes to the contract specifications. The reason plaintiff wanted to vary the stitch margins was to allow plaintiff to use certain camtackers. Although allowed, camtackers were not required to be used under the contract. Camtackers exist that are capable of complying with the NBC bag contract requirements. Plaintiff actually produced its entire FA without using camtackers by using regular single-needle machines. Given the stitching requirements in the contract, upon which plaintiff bid, plaintiff could have either used regular single-needle machines, or bought camtackers from another manufacturer that complied with the contract specifications. Plaintiff is not accurate in characterizing the stitching requirements as a deficiency in the contract making performance impracticable. Defendant, accordingly, is not bound by the time requirements of the IL7 clause.

## CONCLUSION

On the basis of the facts stipulated and specially found and the foregoing conclusions of law, plaintiff has not shown that defendant's personnel delayed the contracts at a time when SPI was prepared to perform or that the government was in breach of its duty of good faith. Although there are instances of delay caused by the government, they were accompanied by unapportioned concurrent delay by SPI. Plaintiff is not entitled to recover any damages on its claims.

Defendant seeks to offset any award made to plaintiff by its own recoupment claim. Defendant has paid plaintiff a total of $1,143,-

072.91 in unliquidated progress payments on the four contracts at issue. Plaintiff is in bankruptcy; defendant does not seek an affirmative award. Plaintiff is not awarded any damages on any of its claims. Accordingly, no determination is made as to the validity of defendant's recoupment claim.

The Clerk is directed to dismiss the complaint. No costs.

# APPENDIX

Joint Stipulations by the parties are in CGTimes font; additional facts derived from testimony and documentary evidence are in italics.

## I. *Contract DLA100–86–C–4438 (NBC Bag Contract)*

### *Background*

1. Silent Partner, Inc. ("SPI") was incorporated in 1982 in Louisiana, and is a small, woman-owned business. Its principal place of business was Gretna, Louisiana, a Labor Surplus Area ("LSA"), until SPI leased a facility in Laredo, Texas in July 1986 prior to award of the NBC bag contract.

2. SPI is a sub-chapter S corporation.

3. When the NBC bag contract was awarded, Tim Zufle was president and chief executive officer of SPI, and Diane Zufle was vice president.

### *Solicitation*

4. The NBC bag was on the procurement list for mandatory purchase from qualified blind workshops. The National Institute for the Blind ("NIB") granted a procurement exception for the initial NBC bag procurement.

5. On April 22, 1986, solicitation DLA100–86–B–0421 was issued by the Defense Personnel Support Center ("DPSC") requesting bids on 1,811,350 NBC bags. The procurement was a combined Small Business and Labor Surplus Area ("LSA") set aside.

6. Amendment A0001 to the NBC bag solicitation, effective May 5, 1986, allotted 905,700 NBC bags to the Small Business set aside and 905,650 NBC bags to the LSA set aside. The amendment also instructed bidders not

APPENDIX—Continued

to submit a bid price on the LSA set aside portion of the solicitation.

7. Amendments A0002 through A0004 each extended the bid opening. SPI acknowledged each of the amendments and submitted its bid on June 30, 1986. Bid opening took place on July 1, 1986.

### *Labor Surplus Area Concern*

8. In response to the information required in the solicitation under clause K 17 52.219–7004 Eligibility For Preference As A Labor Surplus Concern (Apr.1985), SPI provided the following:

Street Address: Texas Industrial Park
City/County/State: Laredo
(Webb County), Texas
Percentage: 90%.

9. By letter dated July 15, 1986, Reyes Industries, Inc. ("Reyes"), a competitor in the bidding, filed a protest with the General Accounting Office ("GAO") challenging SPI's eligibility for the LSA.

10. By letter dated July 21, 1986, DPSC Procurement Contracting Officer ("PCO") Jacqueline Pelullo advised SPI that Reyes had filed a protest with GAO against the award of the LSA set aside portion of the NBC bag solicitation, and informed SPI that it should submit any views regarding the protest directly to GAO with a copy to the PCO.

11. On July 25, 1986, PCO Pelullo wrote a Memo For Record stating that SPI was ineligible for the LSA set aside. On August 4, 1986, Reyes withdrew its protest. On August 7, 1986, SPI filed a protest seeking to prevent DPSC from awarding the LSA set aside to anyone other than SPI.

12. There was no protest of the Small Business set aside portion.

13. On November 7, 1986, the GAO issued an unpublished, written decision finding that SPI was not eligible for the LSA set aside portion of the NBC bag solicitation.

14. The LSA set aside portion of the solicitation was cancelled by the Amendment A0005, issued November 19, 1986, based on

APPENDIX—Continued

reduction of fielding requirements due to Army funding constraints.

15. SPI was billed approximately $55,000 in legal fees for services rendered under the NBC bag solicitation and award through the end of January 1987.

### Preaward Surveys

16. Pre-award surveys were conducted on SPI at both its headquarters in Gretna, Louisiana and its production facility in Laredo, Texas during July and August 1986.

17. After the surveys were completed, and "complete award" was recommended, DPSC requested DCASMA–New Orleans to reevaluate the financial and production capabilities of SPI. On September 29, 1986, SPI changed its initial milestone chart proposing to manufacture 81,000 bags every 15 days, to 81,250 bags every 30 days.

*17(a). After a preaward survey was conducted, the DPSC on September 10 and September 22, 1986, requested additional information from SPI relating to SPI's financial and production capabilities. On September 17, 1986, DCASMA–New Orleans informed PCO Panichelle, that SPI planned to finance the NBC bag materials with Burlington Industries and use lines of credit totaling $615,000 to finance the First Article (FA), and thereafter use progress payments to capitalize the remaining production.*

*17(b). SPI's Special Projects Director with responsibility of overseeing the Laredo operation had no prior government contract experience, no prior clothing and textile experience, and no prior experience with complicated specifications.*

*17(c). The Special Projects Director helped prepare SPI's NBC bag bid. After the bids were opened, the government told SPI that it was concerned that its bid was low, and asked SPI to verify its bid.*

*17(d). SPI informed the government that its bid price was correct. SPI did not ask the Special Projects Director for any input in verifying SPI's price, and SPI did not conduct any new time studies to verify components of its bid.*

APPENDIX—Continued

*17(e). The government relied primarily upon information provided by SPI in determining SPI's financial and production capability. On paper, SPI convinced the government that it had the capability to perform the contract.*

*17(f). At the time that SPI was awarded the NBC bag contract, SPI owed to the United States Internal Revenue Service (IRS) unpaid federal employment taxes dating back to 1984.*

*17(g). SPI intended to use lines of credit or money received from the NBC bag contract, if awarded, to pay its back taxes.*

*17(h). In August 1987, the IRS issued a levy on SPI's bank account for $98,093.06 for taxes dating back to 1984.*

*17(i). SPI failed to disclose in its bid or during the pre-award survey that SPI had existing financial problems.*

18. During the pre-award process, SPI represented to the government that SPI had approximately $200,000 in assets and approximately $128,000 in liabilities, and that SPI had corporate lines of credit totalling $615,000. Diane and Tim Zufle also provided personal financial statements to the government which reflected $6,084,638 in combined personal assets and $247,035 in combined personal liabilities.

*18(a). Prior to the NBC bag contract, SPI only had $3,869 in cash and $29,060 in working capital.*

*18(b). At the time that the NBC bag contract was awarded, SPI had a cashflow problem and was thinly capitalized.*

### Contract Award

19. On October 22, 1986, DPSC awarded to SPI contract number DLA100–86–C–4438, known as the NBC bag contract. The NBC bag contract was a firm fixed-price contract, and required SPI to deliver 650,000 NBC bags at a unit cost of $3.96, for a total contract price of $2,574,000. The contract contained a 100% option quantity clause, which was never exercised.

*19(a). The bid opening date was extended to July 1, 1986, and contract award was due 60 days thereafter, August 30, 1986. Com-*

APPENDIX—Continued

*pletion of investigation of SPI's financial and production capabilities delayed award to October 22, 1986.*

20. The NBC bag contract required eight monthly deliveries (81,250 bags per month) between June 4 and December 30, 1987.

21. At various times, Jacqueline Pelullo and Robert Panichelle were Procurement Contracting Officers ("PCO") on the NBC bag contract.

*21(a). From the April 1986 solicitation to August 1986, the PCO was Jacqueline Pelullo. From October 1986 to August 18, 1987, the PCO was Robert Panichelle. On August 31, 1987, and thereafter, Jacqueline Pelullo was the PCO.*

### SPI's Bid

22. Prior to SPI's bid on the NBC bag contract, SPI's primary experience was in the private sector. SPI manufactured such items as body armor, police bags, bomb blankets, bomb sleds and various other items related to law enforcement protective equipment. With respect to police bags, SPI had made approximately 250 to 300 commercial police bags, which it sold at prices ranging from $29 to $79 per bag.

*22(a). SPI had sold items of protective equipment to federal agencies on a small "discretional" basis. SPI did not, however, have any prior experience in the formal federal procurement process.*

23. As of October 1986, when the NBC bag contract was awarded, SPI had 6 full-time employees, all located in Gretna, Louisiana. Most of SPI's sewing operations were performed by a subcontractor, Alfredo Campos, d/b/a Campos Sewing. Mr. Campos owned most of the machines, which his personnel used to perform sewing for SPI. Mr. Campos stopped performing subcontract work for SPI in late January 1987.

24. SPI intended to relocate, at least temporarily, one of its Gretna, Louisiana employees to Texas, who would serve as contract administrator on the NBC bag contract. Tim and Diane Zufle did not intend to personally relocate to Texas for the NBC bag

APPENDIX—Continued

contract. SPI hired James Dutton as the plant manager for the plant in Texas. SPI fired James Dutton for a variety of reasons, one of which was his role in the FA failure.

25. SPI's bid was based upon an estimate that the manufacture of NBC bags would require 6.06 minutes per bag for cutting, sewing, handling, inspection, and packing operations, utilizing personnel "well into the learning curve."

*25(a). In order to formulate its bid, SPI conducted a trial run of 100 bags. This trial, however, used different materials and equipment than that expected for the actual production. During the trial, SPI used single-needle sewing machines, as opposed to camtackers, and "non-MILSPEC materials." SPI later modified its production rate to 10.842 minutes per bag.*

*25(b). Quality Assurance Representative (QAR) Sophia Borja and her supervisor, Robert Vital, made their first visit to SPI's production facility on November 18, 1986, for the sole purpose of introducing themselves to SPI. The visit was set up by a telephone call between QAR Borja and Diane Zufle. Neither party confirmed in writing any details regarding the visit.*

*25(c). A post award conference was not required under the terms of the NBC bag contract. On December 11, 1986, a post-award conference for the NBC bag contract was conducted by quality assurance personnel in New Orleans, and attended by Diane Zufle and other employees of SPI.*

### Work in Laredo, Texas

26. On December 11, 1986, a post award conference for the NBC bag contract and two other DPSC contracts was held at SPI's headquarters in Gretna, Louisiana.

27. By letters dated December 1, 12 and 23, 1986, SPI requested that QAR Borja from DCASMA San Antonio, Texas, schedule a post award conference with SPI in Texas. Sophia Borja was assigned as the QAR in Texas until June 1987.

*27(a). On January 12, 1987, QAR Borja and others from her office met with Diane Zufle and other employees of SPI for a sec-*

*ond post-award conference on the NBC bag contract.*

28. As of the post award conference held in Texas on January 12, 1987, except for cutting tables, equipment ordered by SPI had not yet arrived at its production facility in Laredo, Texas.

*28(a). SPI's FA of 2,000 bags was due on February 20, 1987, and the first delivery of 81,250 bags was due by June 4, 1987. SPI was not waiting for the conference before ordering the equipment.*

29. After January 12, 1987, SPI began hiring production, quality, and supervisory personnel. Training on limited quantities of NBC bags began the week starting January 23, 1987.

### First Article in Laredo, Texas

30. An expanded FA of 2,000 units was required within 120 calendar days of award of the contract. FA inspection of the NBC bags was conducted by government employees Kermit Lochte, Robert Vital and Sophia Borja during February 24–25, 1987. It was recommended by them to PCO Panichelle that the FA be disapproved.

*30(a). Each member of the government inspection team was responsible for inspecting FA NBC bags. When a defect is noted by one member of the team, it was shown to each of the other members. All members of the team had to agree upon the defect for it to be scored on the defect report.*

*30(b). During the FA examination in February 1987, the government inspection team discussed its findings with SPI at the time of the examination and prior to QAR Borja preparing her report.*

*30(c). The government inspection team recommended to PCO Panichelle that SPI fail the FA examination held on February 24–25, 1987, due to workmanship defects, such as open seams, missing components and thread ends not trimmed.*

*30(d). Only the PCO had authority to fail SPI's FA examination.*

*30(e). SPI did not object to, protest, or appeal the government inspection team's recommended failure of the FA to the PCO.*

*30(f). PCO Panichelle failed SPI's FA examination held on February 24–25, 1987, due to workmanship defects.*

*30(g). Each of SPI's defects related to specific contract requirements. None of the defects noted during the FA examination related to the window pocket, or the Box X or W–W stitches.*

*30(h). As a result of SPI failing its FA examination, SPI fired two of its Laredo managers, including the overall Laredo plant manager, Mr. Dutton, and the Laredo plant Quality Control Director, Mr. Rocha.*

31. By letter dated March 20, 1987, PCO Panichelle sent SPI written notification that production was not authorized.

32. On March 21, 1987, SPI reduced its work force to one shift.

33. On March 30, 1987, SPI sent written notification to the government that it would be ready to submit a second FA on April 13 and 14, 1987, which was conducted on April 13 and 14, 1987.

*33(a). SPI's submission of a second FA was inspected on April 13 and 14, 1987, by government officials QAR Borja, her supervisor Robert Vital, Kermit Lochte and Dr. York.*

*33(b). Prior to the second FA examination, SPI requested that PCO Panichelle waive the chape requirement under the NBC bag contract. However, SPI's request had not been ruled upon prior to the second FA examination.*

*33(c). Each member of the government inspection team reviewed each defect, and each agreed that they should recommend that SPI's second FA be failed, primarily due to defects found in the chape requirement.*

*33(d). Only the PCO could waive the chape requirement.*

*33(e). QAR Borja waited until April 21, 1987 to prepare and send to the PCO an inspection report recommending that SPI's second FA be failed because it failed to meet the chape requirement, to afford SPI an*

*opportunity to resolve the issue with the PCO.*

34. On April 21, 1987, SPI came to DPSC to discuss SPI's second expanded FA. During the meeting, DPSC orally advised SPI that its second expanded FA would be accepted, and that the delivery schedule would be extended.

35. In QAR correspondence, dated April 21, 1987, QAR Borja recommended disapproval of SPI's second expanded FA submission for defects in placement of the chape.

36. By letter dated May 5, 1987, PCO Panichelle advised SPI that production of the NBC bags in Laredo, Texas was authorized.

### Forms DD–1426

37. Rhonda Sonnier, the Quality Assurance Specialist ("QAS") in Louisiana, advised SPI on December 11, 1986 that the inspection office for the NBC bag contract was DCAS-MA San Antonio, Texas.

*37(a). Clause IL7 was incorporated in the contract by amendment A0002, effective May 10, 1986.*

*37(b). SPI inquired into making improvements to the solicitation at the time of the post award conference at the Gretna plant on December 11, 1986. At the conference, QAS Sonnier recommended that SPI use Department of Defense form 1426 (DD–1426) to request such improvements.*

38. SPI proposed changes to the NBC bag in forms DD–1426, consisting of:

a. SPI requested to be allowed to drill holes in the bag for making of location marks for attachments.

b. SPI requested a change in the drawing for the window pocket to show that binding tape along the sides of window pocket is folded around the edge of the window rather than folded double and attached on top of plastic edge.

c. SPI requested a change in stitch placement dimension from ⅟₁₆″ to ⅛″, between an end stitch line on the required ¾″ Box X stitch and the fold-under of the small hanger tape at the window end of the small

hanger attachment to allow use of certain automatic machinery.

d. SPI requested a change of dimension on the W–W stitch to allow ⅛″ from ⅟₁₆″, stitch line clearance in the width (1″ measurement) of the W–W to allow for the use of certain automatic stitching machinery.

*38(a). During a post-award conference in New Orleans on December 11, 1986, SPI told QAS Sonnier that SPI intended to request clarification of the window pocket drawing because SPI was concerned that the plastic name holder might damage the NBC bag. SPI also told QAS Sonnier that SPI had "various recommendations for improvements to the specification."*

*38(b). DD–1426 forms are to be used only to recommend improvements or changes to the specifications themselves. The forms are to be sent directly to the specification preparing activity, in this case Army NATICK.*

*38(c). DD–1426 forms are not supposed to be used to request waivers, deviations, or clarifications of requirements on specific contracts.*

*38(d). SPI did not attach the DD–1426 forms to SPI's letter to Mr. Henry Joseph dated December 23, 1986. The letter to Mr. Joseph predates the date of the DD–1426 forms, which are dated December 24, 1986. DCASMA–New Orleans did not receive any DD–1426 forms from SPI or any other contractor. The letter to Mr. Joseph does not mention the DD–1426 forms. Diane Zufle testified that she attached correspondence with "the Quality Assurance branch of DCASMA San Antonio." The referenced correspondence with the Quality Assurance branch of DCASMA–San Antonio consists of a letter from SPI to QAR Borja, dated December 23, 1986.*

*38(e). SPI did not make any inquiries with QAR Borja regarding the forms DD–1426 after giving her a courtesy copy.*

*38(f). SPI did not send the forms DD–1426 to PCO Panichelle.*

39. On or about February 10, 1987, PCO Panichelle forwarded SPI's letter dated February 6, 1987, which explained SPI's requests for changes, to the agency's technical division for evaluation.

APPENDIX—Continued

*39(a). The first time PCO Panichelle became aware of any requests from SPI for variances or clarifications of the specifications was when SPI sent him a letter dated February 6, 1987.*

*39(b). Clause IL7 of the NBC bag contract did not apply to SPI's requests for variances under the NBC bag contract because they neither identified defective specifications nor identified assembly procedures that adversely affected production, fabrication, or assembly of NBC bags.*

40. SPI's request to drill holes was denied as prohibited by the end-item military specification ("mil. spec.") of the contract.

41. By letter dated March 31, 1987, SPI informed the government it considered the attachment of the window binding tape to be the most significant of the four form DD–1426 requests.

42. The government had already made the change in the drawings to the window pocket prior to the contract being awarded. SPI was provided with copies of the revised drawings on February 23, 1987.

*42(a). All technical questions raised by SPI prior to or at the FA examination were fully responded to at the FA examination ending on February 25, 1987. The only issue outstanding after the FA examination was SPI's requested variance to increase the tolerance of the Box X and W–W stitches.*

*42(b). SPI's requests for stitching variances of the Box X and W–W stitches were forwarded for review to NATICK, the activity responsible for specification preparation.*

43. The two requests in forms DD–1426 to move the location of the Box X stitch and W–W stitch from 1/16″ to 1/8″ from the border were requests for variances to allow SPI to use certain automatic sewing equipment.

*43(a). The NBC bag specifications required contractors to use regular stitching machines. However, "[a]utomatic stitching machines may be used to perform any of the stitch patterns provided the requirements for the stitch pattern, stitches per inch, and size and type of thread are met. . . ."*

APPENDIX—Continued

*43(b). Regular stitching machines could make the Box X and W–W stitches at the 1/16″ tolerance.*

*43(c). SPI used regular single needle machines to make the Box X and W–W stitches when it developed its bid.*

*43(d). SPI used regular needle machines to make the Box X and W–W stitches for the FA quantities of NBC bags.*

44. SPI's two variance requests for stitching changes contained in forms DD–1426 were verbally approved by the PCO on April 21, 1987, and formalized by modification PO0002, dated May 8, 1987.

45. SPI manufactured NBC bags while waiting for responses to its requests for stitching changes informs DD–1426. For instance, SPI manufactured the 2,000 acceptable FA quantity prior to notification that the request was granted.

46. SPI began ordering automatic stitching machines relating to the two requests for stitching changes on April 2, 1987. All of the automatic machines had arrived by July 1987. However, some had to be returned for corrections. Of five computerized Mitsubishi tackers ordered, one arrived severely damaged and only one was fully operational by the end of July 1987. SPI continued to use single-needle machines for many of the operations SPI expected to perform with automatic stitching machines.

*46(a). SPI's production was not adversely affected by the time it took the government to approve SPI's requested variances to the Box X or W–W stitches.*

*46(b). No bags were ever rejected due to the way SPI manufactured the Box X or W–W stitches, either before or after the variance was granted.*

47. By letter dated December 23, 1986, SPI requested a post award conference to be scheduled, and informed QAR Borja that SPI had most of its FA items on hand. SPI also requested that QAR Borja take material samples during the post award conference.

48. At a post award conference in Texas on January 12, 1987, QAR Borja told Diane Zufle that she was awaiting clarification of

the material sampling requirement before taking samples.

49. After receiving a telex from PCO Panichelle on February 23, 1987, telling her to pull samples of material either before, during or after the FA, QAR Borja took samples of material on February 25, 1987.

*49(a). DPSC generally uses the testing requirements contained in DPSCM 4155.3 in its clothing supply contracts. In addition, DPSC generally mails a copy of DPSCM 4155.3 to all contractors requesting a copy of solicitations.*

*49(b). The NBC bag contract incorporated by reference the testing requirements contained in DPSCM 4155.3.*

*49(c). SPI was actually aware that the NBC bag contract incorporated by reference the testing requirements contained in DPSCM 4155.3. SPI incorporated DPSCM 4155.3 into its internal "Inspection & Quality Control Procedures."*

*49(d). DPSCM 4155.3 specified the testing obligations of the parties. DPSCM 4155.3 required SPI to obtain laboratory tests on each lot of material to ensure that they each complied with all specification requirements, and to provide the test results to the government. The government is not required to conduct verification testing of material.*

*49(e). Government verification testing, when performed, consists of sending a sample of the contractor's material together with a copy of the contractor's passing laboratory results to a government laboratory for testing to confirm the results of the contractor's laboratory tests.*

*49(f). DPSCM 4155.3 required SPI to submit to QAR Borja copies of passing laboratory reports at the time samples for verification testing were selected. SPI did not provide QAR Borja with passing laboratory results before or after QAR Borja took samples of SPI's FA material.*

*49(g). The FA clause of the NBC bag contract required SPI to use materials that met all contract specifications. At the time that SPI was awarded the NBC bag contract, SPI believed that the material it was considering*

*purchasing from Burlington would not meet all of the specification requirements. When SPI submitted its FA bags for examination, SPI believed that its material would not meet all of the specification requirements.*

*49(h). The FA clause of the NBC bag contract only required the government to examine "visual and dimensional," aspects of SPI's construction of the FA presentation of NBC bags; it did not require the government to test the material.*

50. On March 10, 1987, SPI authorized its independent laboratory to conduct tests of SPI's fabric. The laboratory issued a report of the testing, dated April 10, 1987. The report indicated that SPI's material met the NBC bag contract requirements for resistance to wetting by organic liquids but did not meet the requirements for dimensional stability of warp.

*50(a). The material required for the NBC bag was not a new fabric. Rather, the 500 denier type 440 Cordura nylon was specified as proper for Class 4 material in a 1985 amendment of a 1982 military specification. This fabric was listed as being obtainable from the DuPont Company.*

*50(b). On April 16 and 30, 1987, the fabric taken by QAR Borja on February 25, 1987, failed to meet the contract specifications for resistance to organic liquids and dimensional stability of warp.*

### Resistance to Liquids and Warp

51. On April 27, 1987, SPI received notification from the government that its initial 4,359 yards of material received during December 1986, failed to meet contract specifications relating to resistance to organic liquids and dimensional stability of warp. On May 6, 1987, SPI attached a copy of its independent laboratory test results to a letter to DPSC, and requested a retest of the material for resistance to wetting by organic liquids and a waiver of the requirements for dimensional stability of warp. SPI continued limited manufacturing using the material until the issue was resolved by modification to the contract. The failures were converted to passing results by modification PO0003, effective June 10, 1987. After modification

PO0003, all of SPI's shipments of material were acceptable to the government as to resistance to organic liquids and dimensional stability of warp.

52. Modification PO0004, effective July 14, 1987, was a duplicate of modification PO0003.

### Shade Testing

53. Both SPI's initial 4,359 yards of material received during December 1986, and 5,306 yards of material shipped by Burlington on or about April 15, 1987, passed the government's shade tests.

54. SPI's first quantity of production materials arrived at SPI in two shipments on June 5 and June 11, 1987. On June 18, 1987, 16 samples of the first shipment were tested for shade; 11 samples passed and five samples failed. On July 13, 1987, 134 samples of the second shipment were tested for shade; 91 samples passed and 43 samples failed. SPI was notified of the 43 failures on July 18, 1987.

55. SPI claims that, based on notification of shade failures, SPI returned 47 rolls of material, and received replacement rolls on August 11, 1987. SPI's replacement rolls passed the government's shade tests.

55(a). *SPI was not in a position to begin full-scale manufacturing until some time after June 5 and 11, 1987, when SPI received its first shipment of production materials. By May 8, 1987, there were no technical problems that would inhibit SPI's full-scale production of NBC bags.*

### Change of Location

56. The NBC bag contract prohibited the change of the place of performance "unless it is specifically approved in advance by the Contracting Officer." The contract also required SPI to produce a FA at the location where subsequent production quantity would take place.

57. On or about August 5, 1987, SPI notified PCO Panichelle by telephone of SPI's intent to change the place of performance from Laredo, Texas to Gretna, Louisiana. By letter dated August 5, 1987, SPI informed

the PCO that SPI would be closing its production facility in Texas within two weeks and listed an address of 123 Lafayette Street at Second Street in Gretna as a new address. The letter also instructed the PCO to communicate with Kimberly Shambo of Mil–Tex, regarding relocation issues.

58. On or about August 14, 1987, Tim and Diane Zufle finalized the purchase of land and buildings located at Square One, Gretna, Louisiana, for a price of approximately $550,000.

59. A warehouse facility located at Square One, Gretna, Louisiana was leased to SPI by Tim and Diane Zufle on August 14, 1987, for $6,000 per month.

60. The lease on SPI's Laredo, Texas facility had not expired in August 1987. It cost SPI approximately $12,000 to settle the lease obligation.

61. SPI wrote to PCO Panichelle on August 14, 1987, regarding SPI's request for change in place of performance.

62. Subsequent to SPI's August 5, 1987, letter to the PCO, SPI's representative, Kimberly Shambo, communicated with PCO Panichelle regarding the issuance of a modification to the contract for relocation of SPI's production facility.

62(a). *Because PCO Panichelle had questions regarding the location of SPI's proposed facility he contacted Kimberly Shambo, SPI's authorized representative. On August 13, 1987, Ms. Shambo told PCO Panichelle that she did not know whether 123 Lafayette Street was the address of the new production facility for the NBC bag contract, and that she would advise him of the correct address at a later time.*

62(b). *On August 20, 1987, Ms. Shambo orally verified the address of SPI's proposed new production facility for the NBC bag contract, and told PCO Panichelle that SPI's new facility was located two blocks from SPI's other facility.*

62(c). *On August 20, 1987, Ms. Shambo also told PCO Panichelle that she would write him a letter verifying the exact address and other details necessary to order a survey of the plant. PCO Panichelle waited for the*

*letter from Ms. Shambo prior to ordering a survey of SPI's new facility. Ms. Shambo did not write a letter to PCO Panichelle regarding the address and other details about SPI's new production facility.*

63. During August 1987, SPI dismantled the entire Laredo plant and packed up all of the equipment and inventory. SPI incurred overtime costs to close the plant and paid its workers "closedown" bonuses.

64. Jacqueline Pelullo replaced Robert Panichelle as the PCO on the NBC bag contract. On September 9, 1987, PCO Pelullo ordered a survey of SPI's new production facility in Gretna, Louisiana. The survey was completed on September 24, 1987, and recommended approval of the change of the place of performance.

*64(a). On or about Labor Day, 1987, PCO Pelullo returned from temporary assignment to another section, and replaced PCO Panichelle as the PCO for the NBC bag contract.*

*64(b). On September 9, 1987, PCO Pelullo spoke with Diane Zufle on the telephone regarding the location and other details about SPI's new facility, and immediately ordered a survey.*

*64(c). It generally takes about 30 days to approve a contractor's change of production facility once a survey of the facility is ordered.*

*64(d). SPI's production was not adversely affected by the time it took for the move to be approved.*

65. SPI converted the vacant warehouse at Square One, Gretna, that SPI leased from the Zufles, into a sewing operation, which was completed during mid-September 1987.

66. On October 4, 1987, SPI wrote to PCO Pelullo regarding SPI's request for change in the place of performance.

67. Modification PO0005, issued October 7, 1987, effected the change in the place of performance.

### First Article in Gretna, Louisiana

68. On December 3, 1987, SPI sent written notification to the government that it would

be ready to present another expanded FA on December 14–15, 1987, which was inspected in Gretna on or about December 16, 1987.

69. By December 1987, SPI had delivered a total of 17,050 NBC bags and had received $876,276 in unaudited progress payments.

70. Verbal approval that the expanded FA in Louisiana was acceptable was given to SPI on December 16, 1987.

71. Production in Gretna, Louisiana was authorized by PCO letter dated January 13, 1988.

### First Claim for Equitable Adjustment

72. On March 7, 1988, SPI submitted its first equitable adjustment claim for $416,-220.55. This claim was revised on April 29, 1988, to $527,912.93. Costs under the claims were itemized. The claim later was determined to be improperly certified.

*72(a). In its claim for equitable adjustment, SPI sought recovery for expressly unallowable costs such as commercial labor, interest, and personal tax penalties. SPI also sought costs that, on their face, could not have been attributable to alleged government delays, such as recruiting expenses, office supplies, dues and subscriptions, etc.*

*72(b). A technical analysis and audit were conducted of SPI's claim by an engineer with DLA's Systems and Engineering Division and an auditor with DCAA.*

*72(c). The engineer and auditor were instructed by PCO Pelullo to assume that 160 days were excusable due to delay in responding to SPI's requests for variances and in taking samples of SPI's material.*

*72(d). At the time, PCO Pelullo did not have knowledge of certain facts which showed that the 160 days of delay requested by SPI were not actionable.*

*72(e). As a result of the analysis and audit, based upon the assumption that 160 days of delay were actionable, all but $119,529 of the $527,912.93 claimed costs were questioned because they included unallowable costs and costs associated with normal start-up. SPI conceded that over $125,000 of the costs claimed were unallowable.*

*72(f).   The Cost and Price Branch of DPSC reviewed the audit of SPI's claim, and issued a report concurring with the audit report findings.*

73.   Negotiations to settle the claim were unsuccessful.

74.   PCO Pelullo's final decision contained in modification PO0007 dated August 11, 1988, stated that SPI was entitled to $119,529 on the first equitable adjustment claim.  Modification PO0007 also revised the delivery schedule, which extended the delivery schedule by 105 days from the date of the modification.

*74(a).   Awards under equitable adjustment claims generally are made by increasing the contract price.*

*74(b).   SPI's contract price was increased by $119,529 after modification PO0007 was issued.*

### November 30, 1988 Claim for Equitable Adjustment

75.   SPI's appeal of PCO Pelullo's final decision regarding the first claim for equitable adjustment, which awarded SPI $119,529, was dismissed without prejudice by the ASBCA because it was improperly certified. The same day, November 30, 1988, SPI submitted a modified total cost claim to the contracting officer for $1,140,074, later reduced to $905,755 due to mathematical errors.

*75(a).   SPI hired Mr. Brodecky of Touche Ross to prepare the quantification portion of the November 30, 1988, claim for equitable adjustment.*

*75(b).   SPI had previously fired Touche Ross for failing to set up an acceptable accounting system.  Mr. Brodecky made $230,-000 in mathematical errors in the November 30, 1988, claim.*

*75(c).   In preparing the claim, Mr. Brodecky did not audit SPI's records or analyze costs by account.  Mr. Brodecky did not know whether claimed costs included commercial labor.*

*75(d).   A technical analysis and audit were conducted by DCAA of SPI's November 30, 1988, equitable adjustment claim.*

*75(e).   The engineer and auditor were instructed by PCO Pelullo to assume that 193 days were excusable delay, consisting of the 160 days under the first claim, and an additional 33 days for delay in approval of SPI's request to change in the place of performance.*

*75(f).   As a result of the analysis and audit, based upon the assumption that 193 days of delay were actionable, all but $189,250 of the $1,140,174 claimed costs were questioned.*

*75(g).   The Cost and Price Branch of DPSC reviewed the audit of SPI's claim, and issued a report concurring with the audit report findings.*

*75(h).   SPI's production workers for the NBC bag contract in Gretna, Louisiana were hired by SPI under local agency programs which provided SPI with 50 percent wage reimbursement.*

*75(i).   SPI did not reduce the amount of its November 30, 1988, claim for equitable adjustment by the amount of wage reimbursements received.*

76.   PCO Pelullo's final decision on SPI's November 30, 1988, equitable adjustment claim was issued in modification PO0009, effective June 2, 1989.  It granted SPI a total of $265,015, as full and final settlement on SPI's equitable adjustment claims under the NBC bag contract.

*76(a).   SPI cannot rely upon the total cost or modified total cost approach to calculate damages for alleged delays under the NBC bag contract because:  (1) there are other available methods of calculating damages; (2) SPI's bid was not realistic; or (3) SPI was responsible for added or increased costs to perform the NBC bag contract.*

*76(b).   In its initial claim for equitable adjustment, SPI itemized costs from over 20 separate categories in its books of account that it claimed were attributable to alleged government delays.*

*76(c).   SPI's initial estimate that it would take 6.06 minutes per bag was based upon a trial run making approximately 100 to 150*

NBC bags using different equipment and materials than what SPI intended to use if it was awarded the contract.

*76(d).* After the contract was awarded and SPI made several thousand NBC bags, SPI revised its production estimate from 6.06 minutes to 10.842 minutes per bag for production of 80,000 bags per month using two shifts.

*76(e).* SPI's bid was based, in part, upon hiring all skilled workers to perform the NBC bag contract. SPI hired only about 5 percent skilled workers to perform NBC bag contract.

*76(f).* SPI's bid was based, in part, upon using two shifts of employees. SPI only used one shift of employees after production was authorized.

*76(g).* SPI's bid was based, in part, on receiving 50 percent wage reimbursements under local government programs. SPI did not receive any wage reimbursements under local government programs while in Texas.

*76(h).* SPI incurred expenses in hiring numerous consultants, attorneys, and accountants. SPI incurred over $50,000 in attorney fees contesting the LSA matter and other matters.

*76(i).* Plaintiff did not establish any proximate cause between the alleged government delays and the damages sought in this action. There was no testimonial or documentary evidence identifying what, when, or how specific tasks or specific employees were affected by alleged government delays. Plaintiff offered no time cards, names of employees, or even identification of any work that was disrupted.

*76(j).* Plaintiff did not differentiate any alleged government delay or disruption from SPI's own concurrent problems that adversely affected SPI's production of bags. SPI was responsible for the fact that it did not have production material in house until June 5 and 11, 1987.

*76(k).* Plaintiff did not establish that SPI actually incurred the costs claimed for alleged delays or disruption.

### *Partial Default Termination*

77. As of February 2, 1988, SPI had delivered a total of 36,250 NBC bags.

*77(a).* By letter dated January 26, 1988, SPI requested that the delivery schedule be extended to permit SPI a lead time of 105 days, or until May 1, 1988, for its next delivery. SPI based the 105–day request upon the original contract amount of lead time between delivery of FA and delivery of the first production quantity.

78. In a February 9, 1988, letter, SPI proposed a new delivery schedule providing for eight monthly deliveries of 81,250 NBC bags between May 1988 and November 1988. The PCO issued modification PO0006, on April 25, 1988, which contained SPI's proposed new delivery schedule.

*78(a).* PCO Pelullo informed SPI that not all of the time that had elapsed from the prior delivery schedule was excusable, and she requested monetary consideration from SPI for extending the schedule.

*78(b).* After unsuccessful attempts to reach SPI to discuss monetary consideration, the PCO issued modification PO0006, without requiring consideration from SPI.

*78(c).* SPI did not meet the delivery schedule in PO0006, despite the fact that SPI proposed the schedule.

*78(d).* SPI requested that the delivery schedule in modification PO0006 be extended because it was formalized too close to the date for the next delivery.

*78(e).* On July 21, 1988, PCO Pelullo requested that SPI propose a revised delivery schedule.

*78(f).* SPI did not propose a delivery schedule.

79. Between February 2, 1988, and the end of July 1988, SPI delivered 45,600 NBC bags.

80. During the Spring of 1988, SPI spun off its commercial operations to a company named Silent Partner Body Armor.

81. Modification PO0007, dated August 11, 1988, scheduled eight monthly deliveries, with the first delivery of 80,650 being due on December 10, 1988.

**340**

*81(a). The delivery schedule contained in modification PO0007 provided SPI with 105 days lead time from the date of the modification before SPI's next delivery, due December 10, 1988.*

*81(b). The delivery schedule contained in modification PO0007 was reasonable.*

*81(c). By letter dated September 15, 1988, PCO Pelullo advised SPI that it must comply with the delivery schedule contained in modification PO0007.*

82. SPI delivered 11,500 NBC bags between August 23, 1988, and December 10, 1988.

83. SPI delivered 1,200 NBC bags on December 22, 1988, and another 1,200 NBC bags on February 13, 1989. SPI did not make any deliveries of NBC bags after February 13, 1989.

84. Modification PO0008, dated March 2, 1989, default terminated five delivery increments or 406,250 bags for failure to deliver in accordance with the schedule contained in modification PO0007.

*84(a). Prior to partially terminating SPI's contract for default, PCO Pelullo wrote a memorandum for record stating the bases for her intent to terminate for default five delivery increments or 406,250 NBC bags.*

*84(b). It is undisputed that SPI failed to deliver in accordance with the delivery schedule contained in modification PO0007.*

*84(c). During this period, SPI did not continue efforts directed at production of NBC bags. After receiving its first batch of production materials in June 1987, SPI chose not to acquire any more production materials. Because SPI only received a total of approximately 64,500 of the required 250,000 yards of materials, SPI only had enough material for 2 months of full-scale production.*

*84(d). After moving to a warehouse in Louisiana that SPI leased from the Zufles, SPI used only one shift of unskilled workers paid, in part, by local agencies under training programs.*

*84(e). Although the revised delivery schedule required eight monthly deliveries of 80,650 bags beginning in December 1988, SPI delivered only 7,200 bags in December and only 1,200 bags in February 1989. SPI completely stopped making deliveries in February 1989, which was prior to the partial termination for default.*

85. By letter dated March 8, 1989, PCO Pelullo requested SPI to submit a revised delivery schedule for the unterminated balance of 148,000 NBC bags.

86. SPI filed for Chapter 11 bankruptcy on April 28, 1989. SPI is currently in Chapter 7 bankruptcy, and Claude Smith is the appointed bankruptcy trustee of SPI.

87. By letter dated June 7, 1989, PCO Pelullo again requested SPI to submit a revised delivery schedule for the balance of 148,000 NBC bags.

88. Modification PO0010, dated August 4, 1989, established monthly deliveries between December 1989 and April 1990 for the remaining 148,000 NBC bags. The delivery schedule in modification PO0010 had been proposed by SPI contingent on an increase in unit price.

89. On March 13, 1990, the Bankruptcy Court issued an order denying SPI's motion to be allowed to assume and perform the balance of the NBC bag contract.

*89(a). Prior to terminating the balance (148,000 NBC bags) of SPI's contract for default, PCO Pelullo wrote a memorandum for record stating the basis for her intent to terminate the NBC bag contract.*

*89(b). SPI was deemed to have rejected the NBC bag contract during bankruptcy.*

**Bankruptcy and Termination of Contract**

90. On May 23, 1990, the automatic stay was lifted so the NBC bag contract could be terminated for default.

91. Modification PO0011, effective May 24, 1990, terminated for default the balance of the NBC bag contract (148,000 bags).

**Accounting System**

92. In March 1987, SPI's cost accounting system did not allocate indirect expenses to

cost objectives, therefore, progress payments were limited to direct material, direct labor and other verifiable direct costs.

93. Eight accountants assisted SPI in setting up an acceptable accounting system between December 1986 and June 1988. Five were retained by SPI as subcontractors, and three were employed by SPI.

*93(a). During 1987, SPI's job cost system did not balance to the general ledger, and SPI had problems in balancing its accounts.*

*93(b). SPI's outside CPA, Mr. Catalanotto, did not verify for DCAA that SPI's costs during 1987 were valid.*

94. On or about June 13, 1988, SPI gave DCAA an accounting demonstration of its Deltex accounting system software program. On August 25, 1988, DCAA issued an audit determining that SPI's accounting system was adequate to support progress payment requests for direct and indirect costs under fixed-price contracts.

### Progress Payments

95. SPI received a total of $1,225,052.34 in progress payments under the NBC bag contract, as follows:

| | | |
|---|---|---|
| Request # 1 | $361,128.00 | Paid 5/19/87 |
| Request # 2 | $515,148.00 | Paid 8/06/87 |
| Request # 3 | $150,441.00 | Paid 5/10/88 |
| Request # 4 | $119,199.00 | Paid 6/13/88 |
| Request # 5 | $ 79,136.34 | Paid 7/20/88 |

96. By the third progress payment request, dated May 5, 1988, the NBC bag contract was in a loss position.

97. On June 22, 1990, PCO Pelullo issued a final decision that SPI owed the government $883,800 in unliquidated progress payments. At this time SPI had already filed its complaint in the United States Court of Federal Claims and did not appeal this final decision.

*97(a). SPI had $883,800 outstanding in unliquidated progress payments at the time the NBC bag contract was terminated.*

*97(b). During SPI's bankruptcy proceedings, the government received $86,104.35 in proceeds from the sale of material that Burlington was holding. This amount reduced*

*the unliquidated progress payments to $797,-695.65 under the NBC bag contract.*

### Deliveries

98. SPI delivered a total of 95,750 of the 650,000 NBC bags required under the contract, as follows:

| | |
|---|---|
| 08/18/87 | 14,650 bags |
| 12/23/87 | 2,400 bags |
| 02/01/88 | 19,200 bags |
| 03/23/88 | 20,400 bags |
| 05/13/88 | 21,600 bags |
| 07/10/88 | 3,600 bags |
| 08/22/88 | 5,500 bags |
| 12/02/88 | 6,000 bags |
| 12/22/88 | 1,200 bags |
| 02/13/89 | 1,200 bags |

### Materials

99. SPI estimated that it would need 250,-000 yards of material to make 650,000 NBC bags, or about one yard of material for 2.6 bags.

100. On July 22, 1986, Burlington wrote a letter to SPI stating that it would contract to deliver material certified to meet military specifications, which would allow SPI to meet all the requirements of SPI's NBC bag contract. Burlington also stated that production materials would be delivered in monthly shipments of approximately 60,000 yards no later than 60 days after order for production quantities. FA materials would be delivered no later than 30 days after order.

101. By invoice dated December 2, 1986, Burlington billed SPI for 4,359 yards of FA material, which SPI received prior to February 1987.

102. In November 1986, SPI and Burlington began discussing the terms under which Burlington would supply SPI with production quantities of material for the NBC bag contract. On December 5, 1986, Burlington signed a purchase order, pending credit approval, for 250,000 yards of NBC bag production material, which SPI signed and returned to Burlington on March 23, 1987. As a condition of supplying production quantities, Burlington initially required SPI to put up a $75,000 certificate of deposit ("CD") as collateral to guarantee the differential not covered by the progress payment clause. The NBC bag contract allowed SPI to receive 90 per-

APPENDIX—Continued

cent of the cost of material in progress payments. Burlington also required that SPI and Mississippi River Bank ("MRB"), which had an assignment of all progress payment proceeds under the NBC bag contract, execute a disbursement agreement requiring progress payment proceeds for Burlington material to be paid directly to Burlington by MRB. The amount of the CD was subsequently reduced to $30,000 with agreement of all parties.

103. The disbursement agreement assigning progress payment proceeds for NBC bag material to Burlington was signed by SPI, MRB, and Burlington shortly after April 10, 1987. On or about April 10, 1987, SPI assigned a $30,000 CD to Burlington.

104. By invoice dated April 15, 1987, Burlington billed SPI for 5,306 yards of NBC bag material, which SPI received on or about April 21, 1987.

105. By another invoice dated April 15, 1987, Burlington billed SPI for 55,681 yards of NBC bag production material, which SPI received in two shipments on or about June 5 and June 11, 1987.

106. Burlington and SPI disagreed on the amount owed to Burlington for NBC bag material. Burlington contended that after the June 5 and June 11, 1987 shipments, SPI was indebted to it by more than SPI acknowledged. Burlington demanded SPI reduce the amount Burlington considered outstanding to within the $30,000 CD collateral. SPI did not pay Burlington any additional money, and Burlington did not make further shipments of NBC bag material.

107. SPI received a total of approximately 64,500 yards of NBC bag material from Burlington. SPI did not receive NBC bag material from any other source.

108. It was SPI's belief that Burlington's credit department was informing other vendors that SPI was a bad credit risk, which was having an adverse impact upon SPI's credit arrangement with other vendors.

109. SPI received $438,759.45 in progress payments from the government for NBC bag material invoiced from Burlington.

APPENDIX—Continued

### Payments of Back Taxes

110. By letter dated September 18, 1987, Diane Zufle of SPI informed the IRS that SPI established an escrow account at MRB into which SPI agreed to deposit the accounts receivable funds from its commercial business. SPI directed MRB to remit 20 percent of the total deposits into this account each week directly to the IRS for payment of back taxes. Between September 29, 1987, and March 31, 1988, MRB sent $36,497 from SPI's escrow account to the IRS.

111. On May 12, 1988, SPI directed MRB, which had received progress payment number three under the NBC bag contract in the amount of $150,441, to make checks payable to the IRS for $100,520.86 and to apply the balance of $49,920.14 to amounts owed by SPI to the bank.

112. On May 12, 1988, Diane Zufle of SPI wrote a letter to the IRS enclosing two cashiers checks totalling $100,520.86. SPI informed the IRS that the first check, in the amount of $79,520.86, is payment of trust fund tax liability for the tax periods ending September 1985, December 1985, June 1986, September 1986, March 1987, and June 1987. SPI informed the IRS that the second check, in the amount of $21,000 represented a partial payment of penalties and interest on prior tax liabilities.

113. SPI received from the Texas Employment Commission a Certification of Delinquent Unemployment Contributions, Penalties And/Or Interest Due as of July 1989. The amount of unemployment contributions due was $5,367.33 for January through March 1987.

### Accounts Payable

114. SPI's Accounts Payable (Past Due) Aging Reports, per Deltex, for February and June 1987 show:

|  | 2/28/87 | 6/30/87 |
|---|---|---|
| Currently due | $155,717 | $402,015 |
| 1–30 days late | 107,633 | 32,094 |
| 31–60 days late | 69,863 | 55,646 |
| 61–90 days late | 10,388 | 67,547 |
| over 90 days late | 61,219 | 111,600 |
| **TOTAL PAYABLE** | **$404,822** | **$668,903** |

APPENDIX—Continued

### Payments to Tim Zufle

115. SPI paid the following amounts, in part, to Tim Zufle:

| Date | Amount | Description |
|------|--------|-------------|
| 1/5/88 | $ 3,500.00 | Advances to Stockholders |
| 3/5/88 | 2,500.00 | Advances to Stockholders |
| 5/19/88 | 1,970.79 | N/P to Stockholders |
| 8/25/88 | 1,500.00 | N/P to Stockholders |
| 8/25/88 | 13,500.00 | N/P to Stockholders (Advance) |
| 12/20/86 | $17,000.00 | N/P to Stockholders |

116. On August 12, 1988, Tim Zufle hand-signed a check in the amount of $10,000 on SPI's Gulf South Bank account payable to Silent Partner Body Armor, Inc. On August 12, 1988, Tim Zufle hand-signed a check in the amount of $11,000 on SPI's First National Bank account payable to Silent Partner Body Armor, Inc.

116(a). SPI had chosen Laredo, Texas as a location, in part, because it was close to the Mexican border, and SPI was considering doing some commercial work in Mexico.

116(b). SPI was interested in the Maquilladora program.

116(c). The Maquilladora program allows certain assembly work under commercial contracts to be done in Mexico. The program required companies to use brokers.

116(d). SPI did not have a broker for the Maquilladora program.

116(e). Tim Zufle asked QAR Borja for help in locating a good broker under the Maquilladora program. QAR Borja told Tim Zufle that she did not know any names, but that her husband did. Tim Zufle asked QAR Borja to write her husband's name and telephone number on a post-it note that Tim Zufle furnished to her.

116A(a). The record includes drafts of a report prepared by the Department of Defense, Office of the Inspector General (DOD–OIG) of an investigation into alleged improprieties and mismanagement by DPSC personnel of the NBC bag contract. The investigation was conducted at the verbal request of Representative John P. Murtha, chairman of the Defense Subcommittee, House Appropriations Committee, pursuant to a request from subcommittee member Representative Bob Livingston on behalf of his constituent, SPI.

116A(b) The draft report, dated March 20, 1990, was prepared by an investigator in the Special Inquiries Directorate in DOD–OIG. The Inspector General sent a draft report on April 5, 1990, to DLA for review and comment. The Inspector General's transmittal letter stated the investigation had determined that DLA employees were dilatory in responding to SPI but "most of their actions had little impact on the contractor's ability to perform," and although SPI had showed some healthy signs of recovery, it "stopped production of its own volition."

116A(c) The draft report was based on a complaint prepared by Diane Zufle that alleged SPI's inability to perform the NBC bag contract was due to arbitrary, capricious, and dilatory actions by DLA employees. The structure of the draft report is based upon a written chronology presented by Diane Zufle to the special inquiries investigator. The investigator, in addition to Diane Zufle, interviewed among others, QAR Borja, PCO Pelullo, PCO Panichelle, and unidentified personnel at DCASR—Dallas and Headquarter DLA. In addition to findings based on incidents in SPI's chronology, the draft report has sections captioned Other Findings, Conclusions, and Recommendations.

116A(d) On May 3, 1990, DPSC's internal counsel advised the General Counsel, DLA that the draft report "duplicates the complaint" filed by SPI, that defendant's answer denied the allegations of breach of contract and corollary impact, and that it would not be prudent to file a response during ongoing litigation. On May 16, 19990, DLA notified the DOD Inspector General that, while it did not concur in the report, it would not be prudent to respond in total during ongoing litigation.

### II. Contract DLA100–87–C–0358 (SV–2B)

117. On November 11, 1986, contract DLA100–87–C–0358 was awarded to SPI for the manufacture and delivery of 7,200 Survival Vests SV–2B ("SV–2B contract") at $54.54 per vest, with a first delivery of June 5, 1987. The total contract price was $392,688.

118. SPI submitted its FA for approval on April 1, 1987. By letter dated May 5, 1987, SPI's FA was rejected.

119. SPI's second FA was accepted, and production was authorized by PCO Panzera's letter dated May 6, 1987.

120. SPI requested a waiver to the shade requirement of the SV–2B contract by letter dated May 15, 1987.

121. Shade, pH, and hydrostatic testing requirements were waived by the government on July 1, 1987, under modification PO0001.

122. SPI executed modification PO0003 on August 14, 1987, extending the delivery schedule. PCO Panzera signed the modification on August 25, 1987. Under this modification, SPI agreed to waive any and all prior government caused delays under the SV–2B contract.

123. By modification PO0004, dated August 27, 1987, the government invoked the option under the contract for SPI to manufacture and deliver an additional 7,200 SV–2B vests, for a total contract price of $785,376.

124. By modification PO0006, dated February 11, 1988, the contract price was increased to $791,920, contingent upon SPI accelerating deliveries.

*124(a). By letter dated January 26, 1988, SPI agreed to increase the delivery quantity of SV–2B vests.*

125. By letter dated July 15, 1988, PCO Panzera notified SPI she would "forbear on the delinquency" on the SV–2B contract pending the outcome of negotiations on the initial equitable adjustment claim submitted by SPI on the NBC bag contract.

*125(a). PCO Panzera granted SPI a forbearance under the SV–2B vest and Mesh Vest contracts to give SPI time to formulate realistic delivery schedules.*

126. By letter dated September 14, 1988, PCO Panzera notified SPI that the forbearance period was over, and requested SPI to submit a revised delivery schedule.

127. An agreed upon delivery schedule was established pursuant to the terms of modification PO0007, issued on December 6, 1988.

This modification required three monthly deliveries of 600 SV–2B vests beginning January 30, 1989, and six monthly deliveries of 900 SV–2B vests thereafter.

128. After July 15, 1988, SPI made only one delivery under the contract, consisting of 448· SV–2B vests on August 22, 1988.

129. PCO Panzera issued a Show Cause letter an February 1, 1989.

130. The SV–2B contract was default terminated on March 23, 1989, for failure to meet the delivery schedule.

131. SPI delivered 7,344 vests out of the required 14,400 SV–2B vests.

132. SPI received $359,516 in progress payments under the SV–2B contract, and payments of $180,913.23 for the 7,344 vests delivered.

*132(a). SPI owes the government $139,701 in unliquidated progress payments for the SV–2B contract.*

*132(b). Based upon SPI's alleged costs incurred under the SV–2B contract, SPI spent approximately twice the contract per unit price for SV–2B vests that were delivered prior to May 1988.*

*132(c). Plaintiff relied upon the total cost theory for claims under the SV–2B, Mesh Vest and Helmet Cover contracts.*

*132(d). With respect to the SV–2B, Mesh Vest and Helmet Cover contracts, plaintiff did not present evidence regarding the necessary prerequisites for using the total cost approach.*

**III. Contract DLA100–87–C–4176 (Helmet Cover)**

133. On April 8, 1987, SPI was awarded the small business portion under contract DLA100–87–C–4176 ("Helmet Cover"), a fixed-price contract to manufacture 657,600 chemical protective helmet covers with a first delivery date of November 19, 1987.

134. Pursuant to the terms of the Helmet Cover contract, SPI was responsible for locating an acceptable source to supply the butyl coated material (the "material") used in manufacturing the helmet covers.

APPENDIX—Continued

135. Pursuant to the terms of SPI's Helmet Cover contract, Toxicological Agent Protective ("TAP") testing was required to be performed by the government's laboratory at Aberdeen Proving Grounds.

136. In developing its bid, SPI obtained quotes from various vendors, including H. Lanau, using material manufactured by Archer Rubber Company, and Putnam Mills, Inc., to supply material for manufacturing helmet covers. SPI elected to use Putnam Mills as its supplier of material.

137. On April 16, 1987, the government issued modification PO0001, awarding the LSA set aside amount to SPI, increasing the quantity under the Helmet Cover contract by an additional 657,600 helmet covers.

138. By letter dated December 7, 1987, SPI was informed by the government that its material had failed toxicological testing.

139. Putnam Mills requested that Archer Rubber submit a sample of material to Aberdeen Proving Grounds for TAP testing. On December 4, 1987, a government inspector obtained samples of Archer Rubber material. However, the request for the government to conduct TAP tests of the samples was cancelled by Putnam Mills before the TAP tests were performed.

140. SPI wrote to the government on January 26, 1988, stating that it was unable to locate a domestic source of the material and requested government assistance in locating other domestic sources. By letter dated March 22, 1988, PCO Pelullo provided SPI with the following three potential sources: Chem–Tech; Aldan Rubber; and Bond Coat of Virginia.

141. By letter dated February 9, 1988, SPI proposed an amended delivery schedule with deliveries to begin on May 2, 1988.

142. By letter dated April 25, 1988, SPI informed the government that of the three firms the government identified in the March 22, 1988 letter, Bond Coat of Virginia was not manufacturing this mil.spec. item and Aldan Rubber would not give SPI a quote. SPI also informed the government that the quote from Chem–Tech for 4,511 usable goods was

APPENDIX—Continued

$2.09 per yard more than that of Putnam Mills for 47″ usable goods. Based upon the quote from Chem-tech, SPI suggested to the government that an economic price adjustment might be required.

143. On May 16, 1988, PCO Pelullo informed SPI that a price increase was not allowed under the terms of the contract, and that any increase in costs to obtain material from another supplier must be borne by SPI. The PCO asked SPI to submit a revised delivery schedule.

144. On June 21, 1988, PCO Pelullo issued unilateral modification PO0003, extending the delivery schedule for the Helmet Cover contract, with a first delivery due on January 31, 1989.

145. SPI did not make any deliveries apart from the FA quantity of helmet covers. SPI never obtained passing and reliable helmet cover material.

146. PCO Pelullo issued a Cure Notice dated December 16, 1988, citing SPI's failure to show progress. By letter dated January 6, 1989, SPI responded to the Cure Notice by saying that SPI was unable to locate a domestic source of passing and reliable material.

*146(a). There were other available domestic suppliers of the material for Helmet Covers at the time that the material supplied by Putnam Mills to SPI failed to meet the contract requirements, including but not limited to Chem–Tech and Archer Rubber.*

147. Modification PO0004 was issued on March 13, 1989, default terminating the Helmet Cover contract.

148. A Helmet Cover contract was later awarded to Technology Products, Inc., which listed Archer Rubber as its source supplier of material.

149. SPI was paid $9,533 in progress payments under the Helmet Cover contract.

*149(a). SPI owes the government $9,533 in unliquidated progress payments for the Helmet Cover contract.*

APPENDIX—Continued

## IV. *Contract DLA100–87–C–0642 (Mesh Vest)*

150. On or about June 11, 1987, contract DLA 100–87–C–0642 ("Mesh Vest") was awarded to SPI for the manufacture and delivery of 7,008 mesh vests for a total award of $467,363.52 with the first delivery of 672 vests scheduled for December 24, 1987.

151. By letter dated February 5, 1988, SPI's FA was accepted by the government and production was authorized.

152. On February 11, 1988, modification PO0004 was issued and signed by SPI extending the delivery schedule for the Mesh Vest contract with the first delivery of 672 vests due February 22, 1988. The extension was given as part of the consideration for acceleration of deliveries on the SV–2B contract.

153. On May 24, 1988, PCO Panzera sent SPI a Show Cause letter.

154. On June 30, 1988, SPI made its only delivery, apart from the FA, consisting of 93 vests, all of which were accepted by the government. There were no further deliveries under the Mesh Vest contract.

155. By letter dated July 15, 1988, PCO Panzera notified SPI she would "forbear on the delinquency" on the Mesh Vest contract pending the outcome of negotiations on the initial equitable adjustment claim submitted by SPI on the NBC bag contract.

156. By letter dated September 14, 1988, PCO Panzera notified SPI that the forbearance period was over, and requested SPI to submit a revised delivery schedule.

157. On November 14, 1988, SPI signed modification PO0006, executed by PCO Panzera on December 6, 1988, which contained a revised delivery schedule with the first delivery of 384 vests due on January 25, 1989.

158. PCO Panzera sent SPI a Show Cause letter dated January 27, 1989. By letter dated February 10, 1989, SPI responded to the Show Cause letter.

159. On March 23, 1989, the Mesh Vest contract was terminated for failure to deliver

APPENDIX—Continued

in accordance with the revised delivery schedule contained in modification PO0006.

160. SPI ordered approximately $190,000 in knitted fabric from Novelty Textile Mills.

161. SPI paid approximately $10,000 to Novelty Textile Mills, and received only enough knitted fabric to make the FA and the 93 Mesh Vests.

162. SPI received over $150,000 in progress payments from the government covering knitted fabric ordered from Novelty Textile Mills.

163. Novelty Textile Mills submitted a claim against SPI in arbitration regarding the disposition of the remaining approximately $180,000 of knitted fabric SPI ordered, but had not paid for or received. Thereafter, Novelty Textile Mills was allowed to sell the knitted fabric to another company.

164. SPI received $201,105 in progress payments under the Mesh Vest contract. There are $196,143.26 in unliquidated progress payments under the Mesh Vest contract.

*164(a). The SV–2B Vest, Mesh Vest, and Helmet Cover each were sealed bid solicitations.*

*164(b). SPI's bids for the SV–2B Vest, Mesh Vest, and Helmet Cover contracts were not contingent upon the award of or performance of the NBC bag contract or any other contract.*

\*   \*   \*   \*   \*   \*